Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
12/09/2022 09:05 AM CST

Dietzel Enterprises, Inc., appellant, v.
J. A. Wever Construction, L.L.C., appellee.

___ N.W.2d ___

Filed September 16, 2022.    No. S-21-106.

1. **Breach of Contract: Damages.** A suit for damages arising from a breach of contract presents an action at law.
2. **Judgments: Appeal and Error.** In a bench trial of a law action, a trial court's factual findings have the effect of a jury verdict and will not be set aside on appeal unless clearly wrong.
3. ____: ____. After a bench trial of a law action, an appellate court does not reweigh evidence, but considers the evidence in the light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party.
4. **Damages: Appeal and Error.** The amount of damages to be awarded is a determination solely for the fact finder, and its action in this respect will not be disturbed on appeal if it is supported by evidence and bears a reasonable relationship to the elements of the damages proved.
5. **Fraud.** In determining whether an individual reasonably relied on a misrepresentation, courts consider the totality of the circumstances, including the nature of the transaction; the form and materiality of the representation; the relationship of the parties; the respective intelligence, experience, age, and mental and physical condition of the parties; and their respective knowledge and means of knowledge.
6. **Negligence: Fraud.** In both negligent and fraudulent misrepresentation cases, whether the plaintiff exercised ordinary prudence is relevant to whether the plaintiff justifiably relied on the misrepresentation when the means of discovering the truth was in the plaintiff's hands.
7. **Contracts.** In order for the implied covenant of good faith and fair dealing to apply, there must be in existence a legally enforceable contractual agreement.
8. **Contracts: Parties.** The implied covenant of good faith and fair dealing exists in every contract and requires that none of the parties do

anything which will injure the right of another party to receive the benefit of the contract.

9. \_\_\_\_: \_\_\_\_. The nature and extent of an implied covenant of good faith and fair dealing are measured in a particular contract by the justifiable expectations of the parties. Where one party acts arbitrarily, capriciously, or unreasonably, that conduct exceeds the justifiable expectations of the second party.

10. **Contracts.** The question of a party's good faith in the performance of a contract is a question of fact.

11. **Breach of Contract: Words and Phrases.** A material breach is a failure to do something that is so fundamental to a contract that the failure to perform that obligation defeats the essential purpose of the contract or makes it impossible for the other party to perform under the contract.

12. **Breach of Contract.** A material breach will excuse the nonbreaching party from its performance of the contract.

13. \_\_\_\_. Whether or not a breach is material and important is a question of degree which must be answered by weighing the consequences of the breach in light of the actual custom of persons in the performance of contracts similar to the one involved in the specific case.

14. **Damages: Evidence.** Evidence of damages must be sufficient to enable the trier of fact to estimate actual damages with a reasonable degree of certainty and exactness.

15. **Damages: Evidence: Proof.** Proof of damages to a mathematical certainty is not required; however, a plaintiff's burden of offering evidence sufficient to prove damages cannot be sustained by evidence which is speculative and conjectural.

16. **Breach of Contract: Damages.** In a breach of contract case, the ultimate objective of a damages award is to put the injured party in the same position the injured party would have occupied if the contract had been performed, that is, to make the injured party whole.

17. **Damages: Proof.** A claim for lost profits must be supported by some financial data which permit an estimate of the actual loss to be made with reasonable certitude and exactness.

Appeal from the District Court for Douglas County: James M. Masteller, Judge. Affirmed in part, and in part reversed and remanded with directions.

Patrick T. Vint and Todd W. Weidemann, of Woods & Aitken, L.L.P., for appellant.

Zachary W. Lutz-Priefert and Frederick D. Stehlik, of Gross, Welch, Marks & Clare, for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Papik, J.

J. A. Wever Construction, L.L.C. (Wever), contracted with Dietzel Enterprises, Inc. (Dietzel), to perform excavation work for the construction of a transmission line. While Wever and Dietzel do not agree on who is to blame, all agree that the project did not go well. Dietzel eventually abandoned the project before its work was done. Unsurprisingly, litigation followed. Dietzel filed a lawsuit asserting various claims against Wever, and Wever asserted a breach of contract counterclaim against Dietzel. Following a bench trial, the district court found that Dietzel was the first party to materially breach the contract and awarded Wever damages. From this judgment, Dietzel appeals, arguing that the district court erred in its rejection of some of its claims, in its finding that Dietzel was not entitled to suspend its performance on the project, and in its damages award. We find that the evidence in the record did not support the entirety of the damages award to Wever but that the district court did not otherwise err. Accordingly, we affirm in part, and in part reverse and remand with directions.

## I. BACKGROUND

The setting for this case is the construction site for a transmission line in Maryland owned by Baltimore Gas & Electric (BG&E). MasTec North America, Inc. (MasTec), was the project's general contractor. Wever and Dietzel, two Nebraska companies, worked as subcontractors on the project. MasTec subcontracted with Wever to lay certain concrete foundations for the line, and Wever subcontracted with Dietzel to excavate the holes where the foundations would be laid.

The parties experienced difficulties from the start. Work was to begin on the project in April 2015, but Dietzel was unable to arrive at the jobsite at the time directed by MasTec. To avoid a delay, the parties agreed that Wever would rent equipment and begin the excavation process until Dietzel could arrive.

After Dietzel arrived, more problems arose. Dietzel had difficulty performing the excavations, and the project began to fall behind schedule. Wever's witnesses at trial generally blamed Dietzel employees' allegedly poor excavation strategy as the cause of the problems and delays. Dietzel's witnesses blamed the jobsite conditions, including the presence of allegedly "undrillable" rock. Dietzel contended that before it submitted its bid, Wever led it to believe that no such rock would be present.

Dietzel later became concerned that it was not being paid for the time and materials it was expending on the project. Of particular concern was whether it would receive payment for change orders it submitted to Wever for the excavation of hard rock it contended was not covered by the contract. Under the contract, however, Wever was not obligated to make payments to Dietzel unless and until it received payment from MasTec, and there was evidence that MasTec was slow to pay bills submitted by Wever.

This all came to a head in the fall of 2015. At that time, Dietzel requested assurance from Wever that Wever was seeking payment of its change orders from MasTec and that Dietzel would be paid for those change orders. Approximately 2 weeks later, Dietzel abandoned the project.

Dietzel later filed this lawsuit alleging claims of breach of contract, unjust enrichment, negligent misrepresentation, and breach of the implied covenant of good faith and fair dealing. Wever filed a breach of contract counterclaim.

Following a bench trial, the district court issued a written order. The district court found that Dietzel committed the first material breach of the contract when it abandoned the project, and it awarded Wever $2,758,250.47 in damages for that breach. It found in favor of Wever on Dietzel's claims of negligent misrepresentation and breach of the implied covenant of good faith and fair dealing, but found that Wever had been unjustly enriched in the amount of $328,507, because it received a payment from MasTec for Dietzel's work but had

not passed that payment on to Dietzel. After offsetting the amounts, the district court determined Wever was entitled to judgment in the amount of $2,429,743.47. Dietzel appealed, and we moved this case to our docket on our own motion.

Additional relevant background is provided in the analysis section below.

## II. ASSIGNMENTS OF ERROR

Dietzel assigns, renumbered and restated, that the district court erred (1) by finding that Wever was not liable for negligent misrepresentation, (2) by finding that Wever was not liable for a breach of the implied covenant of good faith and fair dealing, (3) by finding that Dietzel did not have the right to stop performance of the contract on the grounds that Wever failed to provide adequate assurances of payment, (4) by finding that Wever's failure to make a timely payment was not a material breach of contract, and (5) in its calculation of damages.

## III. STANDARD OF REVIEW

[1] A suit for damages arising from a breach of contract presents an action at law. *Goes v. Vogler*, 304 Neb. 848, 937 N.W.2d 190 (2020).

[2,3] In a bench trial of a law action, a trial court's factual findings have the effect of a jury verdict and will not be set aside on appeal unless clearly wrong. *McGill Restoration v. Lion Place Condo. Assn.*, 309 Neb. 202, 959 N.W.2d 251 (2021). After a bench trial of a law action, an appellate court does not reweigh evidence, but considers the evidence in the light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party. *Id.*

[4] The amount of damages to be awarded is a determination solely for the fact finder, and its action in this respect will not be disturbed on appeal if it is supported by evidence and bears a reasonable relationship to the elements of the damages proved. *Funk v. Lincoln-Lancaster Cty. Crime Stoppers*, 294 Neb. 715, 885 N.W.2d 1 (2016).

## IV. ANALYSIS

We address each of Dietzel's assignments of error below. We take the assignments up in the chronological order of the underlying facts.

### 1. Negligent Misrepresentation

#### (a) Additional Background

Dietzel claims that it came to be involved in the transmission line project as a result of a misrepresentation by Wever. The alleged misrepresentation occurred in January 2015. At that time, Joshua Dezort, acting on behalf of Wever, sent an email to Brandon Kreiling, the operations manager for Dietzel. Kreiling had been involved with estimating projects for Dietzel since 2008 and, at the time, managed Dietzel's submission of bids for potential projects. The email sought a bid from Dietzel for excavation work.

Dezort's email stated:

> Graceton Tline just north of Baltimore. Transmission line runs from Bel Air to Pylesville. 82 Drilled pier. There will be an outage so no energized lines overhead. Work would start end of Feb. Top 4″ is loose running around 5 to 7 blows. Then increases about 30 blow from 7′ to 20′. 20′ plus runs around 50 blows with some holes a 90 blows down 30′. There is an adder for rock excavation if required. The rock is Schist, which is sheet like rock consisting of mud and clay. Let me know if you are good with $1000 per cubic yard for rock excavation if required. There is 15 holes that you will hit rock on. On the schedule it shows depth of rock and depth of hole.

Within 30 minutes of this email, Dezort sent Kreiling a geotechnical report. The geotechnical report provided details about small test holes drilled in the area of the jobsite. Thirteen test holes had a notation of "auger refusal," which indicated that when the test hole was being drilled, the device used to drill the test hole hit something that prevented it from going any deeper. Kreiling testified that "auger refusal" could

have been caused by encountering rocks that were small in comparison to the excavating equipment, by a rock shelf, or by full rock. The geotechnical report also indicated that "[v]ery hard materials were encountered in . . . 19 of the 31 borings at depths ranging from 13.5 to 33.5 feet below the existing ground surface."

The geotechnical report also had a section titled "Regional Geology." This section stated:

> [T]he project area is underlain by residual soils derived primarily from the in-situ weathering of the underlying bedrock (Wissahickon Formation) and several of its members in this portion of the county, which include the Lower Peltic Schist, and Boulder Gneiss, which are comprised primarily of a fine to medium grained chlorite, muscovite schist with zones of quartzite, metagraywacke, and gneiss. A small portion of the transmission alignment also appears to be underlain by rocks associated with the Ultramafic and Gabbroic Rock, comprised of metagabbros, talcs, serpentinites, actinolite schists.

Dezort testified that metagraywacke is "a type of quartz schist rock," that gneiss is "similar to schist, but . . . much harder and more compressed over time," and that "muscovite schist with zones of quartzite" would mean that there would be a possibility of hitting quartz. Kreiling admitted that the geotechnical report was the best source of information about subsurface conditions and that it was available to him when he formulated Dietzel's bid.

Dietzel submitted a bid to Wever to perform the excavation work for $722,000 and estimated that it would be able to complete the work in 100 days. Wever accepted Dietzel's bid.

When Dietzel began its excavation work, it discovered granite and quartz. According to Dietzel, this was contrary to a sentence in Dezort's initial email stating that the rock would be "[s]chist, [a] sheet like rock consisting of mud and clay." Dietzel's president, Andrew Dietzel, alleged at trial that the hard rock Dietzel encountered was "undrillable" and that if he

had known the project was going to require the excavation of granite and quartz, Dietzel would not have submitted a bid. Kreiling also testified that, based on Dezort's representation that the rock was schist, he bid the job believing that any rock encountered would "break up well" and be easily excavated.

Based on this information, Dietzel asserted a claim of negligent misrepresentation. The district court rejected the claim, finding that Dietzel did not justifiably rely on the representation in Dezort's email.

### (b) Analysis

Dietzel contends that the district court erred in finding that it did not justifiably rely on Dezort's representation and that it proved all other elements of its negligent misrepresentation claim. We focus on the issue of justifiable reliance, because we find it resolves Dietzel's argument.

[5,6] In order to prevail on a claim of negligent misrepresentation, the plaintiff must prove justifiable reliance on the alleged misrepresentation. See, e.g., *Lucky 7 v. THT Realty*, 278 Neb. 997, 775 N.W.2d 671 (2009). In determining whether an individual reasonably relied on a misrepresentation, courts consider the totality of the circumstances, including the nature of the transaction; the form and materiality of the representation; the relationship of the parties; the respective intelligence, experience, age, and mental and physical condition of the parties; and their respective knowledge and means of knowledge. *Nathan v. McDermott*, 306 Neb. 216, 945 N.W.2d 92 (2020). In both negligent and fraudulent misrepresentation cases, whether the plaintiff exercised ordinary prudence is relevant to whether the plaintiff justifiably relied on the misrepresentation when the means of discovering the truth was in the plaintiff's hands. *Id.* We have treated the question of whether a plaintiff justifiably relied on a representation as a question of fact. See *Lucky 7, supra*.

Dietzel contends that the statement in Dezort's email regarding schist was a positive statement of fact and that thus, under

our law, Dietzel was justified in relying upon it and had no obligation to further investigate it. In support of this contention, Dietzel correctly points out that we have said that a plaintiff is justified in relying upon a positive statement of fact if an investigation would be required to discover its truth. See *Nathan, supra*. We have stated, however, that this is a "general rule." *Lucky 7*, 278 Neb. at 1003, 775 N.W.2d at 676. Accord *Omaha Nat. Bank v. Manufacturers Life Ins. Co.*, 213 Neb. 873, 332 N.W.2d 196 (1983). And we have also made clear that this principle does not permit a plaintiff to focus exclusively on an alleged misrepresentation and ignore other information in its possession. See *Lucky 7, supra*.

Here, Kreiling claims to have understood Dezort's email to represent that the only rock Dietzel would encounter in its excavation would be schist, a "sheet like rock consisting of mud and clay." Significant evidence, however, suggested that Dietzel was not justified in relying on such an understanding. The alleged misrepresentation appears in a terse email introducing the idea of Dietzel's submitting a bid on the project. In that email, Dezort did not specifically state that the only rock in the area would be schist or otherwise indicate that the area would not have other rock that was more difficult to drill. In addition, shortly after sending the introductory email, Dezort sent the geotechnical report, which contained detailed and more technical information. Kreiling, who had years of experience reviewing such information and submitting bids, admitted that this additional information was the best source of information regarding subsurface conditions. This information reported the "auger refusal" that occurred during testing and the discovery of "[v]ery hard materials" in a number of locations. It also listed various types of rock found in the area, which Dezort testified indicated the presence of rock that was "much harder [than] schist," as well as quartz. Viewing all this evidence in the light most favorable to Wever, we cannot conclude that the district court clearly erred by finding that Dietzel did not establish justifiable reliance.

## 2. Good Faith and Fair Dealing

### (a) Additional Background

Dietzel also contends that Wever is liable for failing to take certain actions shortly after it began work on the project. Wever arrived at the project site in early April 2015, but Dietzel was unable to begin work at that time. To avoid falling behind schedule, the parties agreed that Wever would rent equipment and begin to perform a portion of the excavation work for which Dietzel had submitted a bid.

Wever began excavation work at a location provided by MasTec, but it soon encountered materials that were too hard for it to excavate. Wever responded by moving to another location where Wever did not encounter the same difficulties. Wever did not, however, inform Dietzel about the hard rock discovered in its initial excavation work.

When Dietzel arrived at the scene several weeks later, it was directed to begin excavating in the area where Wever encountered hard rock. Like Wever, Dietzel encountered hard rock that was difficult to excavate.

Dietzel alleged that Wever's failure to disclose that it had discovered hard rock was a breach of its implied covenant of good faith and fair dealing. The district court rejected the claim, reasoning that Wever was not obligated to inform Dietzel about the hard rock, because the existence of hard rock was something Dietzel should have contemplated given the information that was available to it at the time it submitted its bid.

### (b) Analysis

Dietzel contends that the district court erred by finding that Wever did not breach the implied covenant of good faith and fair dealing. Relying again on the reference in Dezort's email to schist, Dietzel contends that Wever was obligated to inform Dietzel about the hard rock. When it did not, Dietzel submits, Wever breached the implied covenant of good faith and fair dealing.

[7] We note that at the time Wever initially discovered hard rock in early April 2015, the parties' subcontract had not been executed. The subcontract was dated April 24, 2015. Dietzel apparently takes the position that Wever's implied duty of good faith and fair dealing arose prior to the execution of the subcontract. We have said that in order for the covenant of good faith and fair dealing to apply, there must be in existence a legally enforceable contractual agreement. *Acklie v. Greater Omaha Packing Co.*, 306 Neb. 108, 944 N.W.2d 297 (2020). At least one court has expressly held that the duty of good faith and fair dealing is not imposed until an agreement has been reached and that a plaintiff must rely on other theories of recovery for alleged deception prior to a contract being formed. See *Husman, Inc. v. Triton Coal Co.*, 809 P.2d 796 (Wyo. 1991). We nonetheless assume for the purpose of our analysis that Wever was bound by the covenant of good faith and fair dealing when it discovered the hard rock.

[8-10] The implied covenant of good faith and fair dealing exists in every contract and requires that none of the parties do anything which will injure the right of another party to receive the benefit of the contract. *In re Application of Northeast Neb. Pub. Power Dist.*, 300 Neb. 237, 912 N.W.2d 884 (2018). The nature and extent of an implied covenant of good faith and fair dealing are measured in a particular contract by the justifiable expectations of the parties. *Id.* Where one party acts arbitrarily, capriciously, or unreasonably, that conduct exceeds the justifiable expectations of the second party. *Id.* The question of a party's good faith in the performance of a contract is a question of fact. *Spanish Oaks v. Hy-Vee*, 265 Neb. 133, 655 N.W.2d 390 (2003).

We find no clear error in the district court's conclusion that Wever did not breach the implied covenant of good faith and fair dealing. For reasons we have already explained, the district court did not clearly err by finding that Dietzel could not justifiably rely on Dezort's email to believe that only schist would be encountered in the excavation. The same evidence

that supports that conclusion supports a conclusion that Wever did not breach the implied covenant of good faith and fair dealing. If Dietzel could not justifiably rely on Dezort's email to believe the work involved only schist, we do not see how it could justifiably expect to be informed if Wever encountered rock other than schist, nor do we see how Wever could be said to have acted arbitrarily, capriciously, or unreasonably by not disclosing that information.

## 3. ADEQUATE ASSURANCES

### (a) Additional Background

Dietzel's next two assignments of error pertain to its contention that when it abandoned the project in October 2015, it was legally entitled to do so. In order to discuss these assignments of error, it is necessary to set forth a fairly detailed discussion of the way in which parties on the project were paid.

The parties entered into what they refer to as a "paid-when-paid" contract. The phrase "paid-when-paid" refers to the fact that Wever was contractually required to make payment to Dietzel only after it received payment from MasTec. The contract provided that Wever was to make payment within 7 days of receiving payment from MasTec.

Dietzel sent Wever two types of invoices. One type sought "progress payments" under the contract—the payment Dietzel was owed for the percentage of work it had completed from its scope of work. The other sought payment of "change orders"—a request for payment for additional work Dietzel claimed was not covered by the contract. Wever was then expected to submit these requests for payment, with a contractually authorized markup, to MasTec.

Dietzel submitted an invoice to Wever dated July 1, 2015, for progress payments for April, May, and June. Wever sent checks to Dietzel for progress payments in July, August, and September: It sent Dietzel a check for $41,706 dated July 17, 2015; a check for $68,708 dated August 10, 2015; and a check for $15,143.06 dated September 30, 2015. Kathryn Hisel, the

chief financial officer of Wever, testified that it often took MasTec 60 to 90 days after Wever sent a bill to send a payment to Wever.

Dietzel submitted its first change order for excavating hard rock on July 19, 2015. The change order sought payment of $328,507.

The owner of Wever, James Wever, testified that he attended a meeting in late July 2015 in which the change order was discussed. James Wever testified that Andrew Dietzel and representatives of BG&E and MasTec were also present. According to James Wever, BG&E and MasTec did not commit to paying the change order, but did agree to review it and provide them with an answer "at a later time."

Dietzel employees made inquiries with Wever regarding the status of the change order after it was submitted. On August 6, 2015, a Dietzel employee emailed Dayna Wever, Wever's president, and asked about the change order. Dayna Wever responded:

> [T]he rock change order is out if [sic] our hands and is on the table with Mas[T]ec and BG[&]E. Change orders are not paid until approved by owner. We will pay you when and if we are paid. . . . As I told Andrew [Dietzel] in our phone conversation last week, I am emailing and asking about it everyday [sic] and when we hear something I will definitely pass it on to you!!

On August 14, 2015, Dietzel submitted a second change order for excavating hard rock, requesting an additional $73,943.

Hisel and Dezort testified that Dietzel's change orders were submitted to MasTec. Dezort testified that when a change order was pending, Wever would "keep on asking [about] the status of that change order during the duration of the project." Andrew Dietzel acknowledged during his testimony that no one at Wever ever disputed his change order requests, indicated that they were rejecting a change order request, or stated that they would not pursue the change orders.

At some point, BG&E clarified that it would not grant Dietzel's change orders related to rock excavation until 288 cubic yards of rock had been excavated. On September 7, 2015, Andrew Dietzel communicated to Wever by email that, unless its change orders were granted, Dietzel would not excavate where it had encountered hard rock. In response, Wever sent a letter explaining it had "pursued a change order with MasTec and BG[&]E on [Dietzel's] behalf"; that pursuant to the subcontract, it would pay Dietzel only if it first received payment; and that MasTec and BG&E had denied the change order request until 288 cubic yards of rock had been excavated.

On September 24, 2015, Dietzel sent a letter requesting that Wever provide assurance within 7 days that it was "pursuing Dietzel's claims for outstanding progress payments and change orders" and that it would "receive payment of these outstanding amounts." On September 25, Dayna Wever forwarded Andrew Dietzel an email from a representative of MasTec. The MasTec representative had asked in his email, "Which foundations hit undrillable rock?" Andrew Dietzel responded with information about the specific foundations.

On October 5, 2015, Dietzel abandoned the project. Andrew Dietzel sent Dayna Wever a letter explaining Dietzel's decision to leave. Among the reasons he cited were Wever's failure to provide assurances of payment and failure to provide documentation that it was "prosecuting Dietzel's claims." Based on these failures and others, Andrew Dietzel wrote, Dietzel considered Wever in material breach of the contract. The district court found that Dietzel committed the first material breach of the contract when it abandoned the project.

(b) Analysis

Dietzel argues that the district court erred by finding that it committed the first material breach of the contract. Dietzel contends that when it did not receive adequate assurance that Wever was pursuing its change order requests with

MasTec and that Wever would pay Dietzel for its change order requests, Dietzel had the right to suspend contractual performance.

Dietzel cites the Restatement (Second) of Contracts § 251 (1981) to argue that it had the right to request assurance of Wever's performance of the subcontract and that because Wever did not provide such adequate assurance within a reasonable time, Dietzel was permitted to treat the failure as a repudiation of the subcontract. While this court has not yet adopted § 251 of the Restatement, see *McKinnis Roofing v. Hicks*, 282 Neb. 34, 803 N.W.2d 414 (2011), we need not decide whether to adopt it here, because, even if we were to adopt it, Dietzel cannot show that it would apply.

Section 251 states:

> (1) Where reasonable grounds arise to believe that the obligor will commit a breach by non-performance that would of itself give the obligee a claim for damages for total breach under § 243, the obligee may demand adequate assurance of due performance and may, if reasonable, suspend any performance for which he has not already received the agreed exchange until he receives such assurance.

> (2) The obligee may treat as a repudiation the obligor's failure to provide within a reasonable time such assurance of due performance as is adequate in the circumstances of the particular case.

Restatement (Second) of Contracts § 251 at 276-77.

Dietzel argues that Wever was obligated to assure it that it was "prosecuting" Dietzel's change orders with MasTec and that it would pay Dietzel for its change orders. But Wever would have such an obligation under § 251 only if Dietzel had "reasonable grounds . . . to believe" that Wever would "commit a breach by non-performance." Viewing the evidence in the light most favorable to Wever, we cannot say that Dietzel had reasonable grounds to believe that Wever was or would be committing a breach.

Significant evidence was introduced at trial showing that Dietzel did not have reasonable grounds to believe that Wever was not pursuing payment of the change orders. Wever employees testified that Dietzel's change orders were submitted to MasTec. Andrew Dietzel acknowledged that no one at Wever suggested otherwise. Beyond that, there was testimony that Andrew Dietzel was present at a meeting with James Wever and representatives from BG&E and MasTec in which the first change order was discussed. Further, Dayna Wever's email to a Dietzel employee stated that Dayna Wever was repeatedly asking MasTec about it and she had told Andrew Dietzel as much. Finally, the September 9, 2015, letter informed Dietzel that Wever had "pursued a change order with MasTec and BG[&]E on your behalf."

Faced with all this evidence that Wever was submitting its change orders and pressing MasTec to approve them, Dietzel focuses on the September 25, 2015, email Dayna Wever forwarded to Andrew Dietzel, in which a MasTec representative asked, "[w]hich foundations hit undrillable rock?" Dietzel argues that this email shows that Wever had not been submitting its change orders because the MasTec representative did not know that Dietzel had been excavating undrillable rock. This does not strike us as a likely interpretation, let alone the only reasonable one. Taken at face value, the question simply sought clarification on which foundations were at issue.

Based on the evidence that Wever was consistently communicating that the change orders were being pursued, as well as the evidence that Dietzel had actual knowledge that the July 2015 change order was submitted, Dietzel did not have reasonable grounds to believe that Wever had or would breach any obligation with respect to the pursuit of Dietzel's change orders.

We also conclude that at the time of its September 24, 2015, letter requesting assurances, Dietzel did not have reasonable grounds to believe that Wever would breach the subcontract by not making payment on its change orders. Here, it was not

enough for Dietzel to show that it had a reason to believe that it might not receive payment for all the change orders it submitted. Rather, Dietzel must have had reasonable grounds to believe that Wever would *breach the subcontract* by not paying its change orders. See Restatement (Second) of Contracts § 251 at 276 (obligation to provide assurance applies "[w]here reasonable grounds arise to believe that the obligor will commit a breach by non-performance"). This distinction is relevant because of the paid-when-paid clause. Because the subcontract obligated Wever to make payment only if it received payment from MasTec, Dietzel must show that it had reasonable grounds to believe that Wever might receive payment from MasTec on a Dietzel change order and refuse to pass along payment to Dietzel. The evidence does not support a finding that Dietzel had reasonable grounds to believe this. At the time that the request for assurances was made, Wever had timely made contractually obligated payments to Dietzel, and Dietzel does not direct us to anything in the record suggesting that it would not do so in the future.

### 4. Material Breach

#### (a) Additional Background

In addition to its adequate assurances theory, Dietzel contends that it was also legally entitled to abandon the project on October 5, 2015, because Wever had materially breached the contract. Its claim of material breach rests on Wever's receipt of a payment from MasTec on September 22 and failure to make payment to Dietzel for the portion to which it was entitled by September 29, as required by the paid-when-paid clause.

There appears to be no dispute that Wever did, in fact, receive payment from MasTec on September 22, 2015. On September 30, Dayna Wever emailed Andrew Dietzel stating that Wever had received a payment from MasTec and would be sending Dietzel its contractually required portion promptly. The district court found that Dietzel received the check for

$15,143.06 on October 6, which was 1 day after it abandoned the jobsite.

The district court determined that because the payment was not made by the time required by the subcontract, Wever committed a breach. The district court concluded, however, that the breach was not material and that thus, Dietzel's nonperformance of the contract was not excused.

(b) Analysis

[11,12] Dietzel argues that the district court erred when it found that Wever's untimely payment was not a material breach of the subcontract. A material breach is a failure to do something that is so fundamental to a contract that the failure to perform that obligation defeats the essential purpose of the contract or makes it impossible for the other party to perform under the contract. *Siouxland Ethanol v. Sebade Bros.*, 290 Neb. 230, 859 N.W.2d 586 (2015). A material breach will excuse the nonbreaching party from its performance of the contract. *Id.* Unless there is only one reasonable conclusion regarding the issue, in which case a court decides the issue as a matter of law, whether a breach was material is a question of fact. See *id.*

We understand Dietzel to primarily argue that *any* delayed payment to a construction contractor is a material breach as a matter of law. Dietzel claims that because timely payment to a contractor is critical to the contractor's ability to cover its expenses and continue working, delayed payments are always material breaches. We are not persuaded.

[13] We have said that whether or not a breach is material and important is a question of degree which must be answered by weighing the consequences of the breach in light of the actual custom of persons in the performance of contracts similar to the one involved in the specific case. *Siouxland Ethanol, supra*. A test that considers the degree and consequences of the breach does not lend itself to the kind of bright-line rule Dietzel asks us to adopt. Furthermore,

this does not appear to be the prevailing rule in construction law. A construction law treatise relied on by Dietzel states, "Nonpayment [of a construction contractor] for limited periods or in insignificant amounts, while annoying, rarely are deemed to constitute material breaches." 5 Philip L. Bruner & Patrick J. O'Connor, Jr., Bruner and O'Connor on Construction Law, § 18:26 at 959 (2002). A case Dietzel cites similarly disavows the "suggest[ion] that every delay in payment will justify a contractor in terminating performance under an installment contract." *Zulla Steel, Inc. v. A & M Gregos, Inc.*, 174 N.J. Super. 124, 132, 415 A.2d 1183, 1187 (1980).

Dietzel nonetheless maintains that under Nebraska law, delayed payments to contractors are material breaches. In support of this argument, Dietzel relies on a fairly recent case, *Goes v. Vogler*, 304 Neb. 848, 937 N.W.2d 190 (2020), and a very old one, *Howard County v. Pesha*, 103 Neb. 296, 172 N.W. 55 (1919). While *Goes* affirmed a district court's finding that a particular nonpayment to a contractor was material, we did not hold that all such delayed payments are material. As for *Howard County*, in that case, this court did find that a county's failure to pay a contractor as required by the contract entitled the contractor to suspend performance. And, to be fair, the court quoted some language from other jurisdictions that could be read to suggest that the failure to make payments to a contractor as required justifies the contractor in abandoning the work. That said, in more than a century since *Howard County* was published, we do not appear to have ever cited the case in a published decision and the idea that any delay in paying a construction contractor is a material breach as a matter of law is inconsistent with our material breach jurisprudence. To the extent *Howard County* suggests otherwise, it is disapproved.

Of course, none of this precluded Dietzel from contending that, under the circumstances of this case, Wever's delay in payment amounted to a material breach. The district court rejected that argument, however, and therefore, we may reverse

its factual determination only if we find that it was clearly wrong. We do not believe it was. When Dietzel abandoned the project, the payment was about a week late, but Wever had communicated to Dietzel 1 day after the payment was due that it would be forthcoming. That is the only evidence we have of Wever's making a late payment under the contract. Further, Dietzel does not contend that Wever ultimately paid less than the amount due, and the amount paid was relatively small in comparison to the overall value of the contract. Neither does Dietzel direct us to any specific evidence in the record that without this payment, it would have been unable to continue its work.

For the reasons provided above, we find the district court did not err in concluding that Dietzel committed the first material breach of the parties' contract.

## 5. Damages

### (a) Additional Background

Wever relied on testimony from Hisel in an attempt to prove damages for Dietzel's alleged breach of contract. Hisel testified about several expenses Wever incurred in the course of the transmission line project. For each such expense, she identified a specific amount for which Wever was claiming damages. She testified that she arrived at those amounts by taking expenses Wever incurred and increasing them by 15 percent pursuant to a contractual term which permitted Wever to add a markup to expenses incurred by Dietzel. With respect to most of the expenses she testified to, Hisel testified that they were costs Wever incurred after Dietzel had left the job. She admitted, however, that some of the expenses Wever incurred prior to Dietzel's departure.

In addition to expenses incurred by Wever, Hisel briefly testified that as a result of Dietzel's actions, Wever lost the ability to complete a segment of the transmission line project and that, as a result, Wever lost $1,795,317. She testified that number "was what [the lost segment] was supposed to be, our

gross proceeds." She did not further explain how the number was calculated. Hisel also testified that her calculations did not include an amount for the loss of future work with MasTec, because there was "no way to give that an actual number."

The district court received a spreadsheet summarizing Hisel's testimony regarding the damages sought by Wever. The spreadsheet included expenses Wever incurred, as well as a line item for "Lost Revenue" for the "Lost Segment" of the project in the amount of $1,795,317. Those items totaled $4,263,479.99.

On cross-examination, the district court received into evidence several invoices corresponding to Wever's claimed damages. These exhibits showed some additional expenses referenced by Hisel were incurred before Dietzel abandoned the jobsite. Hisel also admitted on cross-examination that the invoices demonstrated that when she had increased the expenses to account for the contractual markup, she had erroneously increased the expenses by 20 percent rather than 15 percent. Additional details about the evidence related to damages are incorporated in the analysis below.

The district court found that Wever was entitled to damages that resulted from Dietzel's materially breaching the contract when it abandoned the jobsite. It stated that it found that Dietzel's abandonment resulted in damages to Wever, including the loss of a portion of the project. It acknowledged that evidence and testimony at trial revealed calculation errors in Wever's claimed damages, but found that Wever proved damages proximately caused by Dietzel's breach in the amount of $2,758,250.47. The district court specifically stated that this damages amount was for damages caused by Dietzel's abandoning the project.

The district court also noted an argument from Wever that it suffered damages in the form of lost profits from jobs that it could have otherwise completed while it was completing this project and from future work with MasTec. The district court then stated, "The Court finds that Wever failed to prove its claims for lost profit related to future MasTec jobs or

other lost profit as proximately caused by Dietzel's breach of contract."

The district court offset its damages award to Wever by $328,507, an amount it found Wever had been unjustly enriched by Dietzel. After including the offset, it found that Wever was entitled to $2,429,743.47. Wever does not challenge the unjust enrichment damages on appeal.

(b) Analysis

Dietzel argues that even if the district court did not err in finding it liable for breach of contract, it erred in its calculation of Wever's damages. It argues that the evidence does not support the amount of damages awarded by the district court. Before addressing Dietzel's arguments, we briefly review the governing legal standards.

[14,15] We have said that "damages, like any other element of the plaintiff's [cause of action], must be pled and proved and that the burden is on the plaintiff to offer evidence sufficient to prove the plaintiff's alleged damages." *Pan v. IOC Realty Specialist*, 301 Neb. 256, 276, 918 N.W.2d 273, 291 (2018). Evidence of damages must be sufficient to enable the trier of fact to estimate actual damages with a reasonable degree of certainty and exactness. *Id.* Proof of damages to a mathematical certainty is not required; however, a plaintiff's burden of offering evidence sufficient to prove damages cannot be sustained by evidence which is speculative and conjectural. *Id.* Although the standard of review on appeal for the amount of damages is generally deferential to the trier of fact, the question of whether the evidence of damages is reasonably certain is a question of law. See, *id.* (damages award "will not be disturbed on appeal if it is supported by evidence and bears a reasonable relationship to the elements of the damages proved"); *Pribil v. Koinzan*, 266 Neb. 222, 227, 665 N.W.2d 567, 572 (2003) ("[w]e have consistently framed the question whether the evidence of damages is 'reasonably certain' as a question of law . . .").

### (i) Expenses Incurred Before
### Dietzel Abandoned Jobsite

Dietzel argues that a number of the expenses Hisel testified to cannot support the district court's damages award because the evidence shows that they were incurred prior to Dietzel's abandonment of the project. Dietzel argues that the following expenses fall into that category: expenses associated with the rental and delivery of an auger; the rental, delivery, repair, and return of a "Watson" drill; the rental of a hammer drill and compressor; "slurry"; and a lump sum requested for miscellaneous equipment Wever rented from United Rentals; as well as various expenses from Greene Construction.

We agree with Dietzel as to the auger delivery, Watson drill delivery and repair, hammer drill and compressor, and slurry, because the undisputed evidence showed those were expenses Wever incurred before Dietzel abandoned the jobsite. As for the other expenses, invoices received by the district court show that an identifiable portion of the expenses were incurred after Dietzel departed. We find that the evidence would thus support an award of damages for those identifiable portions. Adjusting for Hisel's calculation error on the contractual markup, we find that the evidence would support awarding Wever $4,443.60 for the return of the Watson drill, $1,886 for the expenses from Greene Construction, and $5,942.63 for the auger rental.

This leaves the costs for renting the Watson drill and the miscellaneous rentals from United Rentals. We find the evidence for these two expenses suffer from the same deficiency: The finder of fact would have been forced to speculate as to what amount of the requested damages were incurred after Dietzel abandoned the jobsite.

On the Watson drill, the record is inadequate to determine with reasonable certainty what portion of the damages were related to the drill and Dietzel's abandonment of the jobsite. Although the record includes invoices for those months after Dietzel's departure, the invoices list a single price for the

Watson drill and a "2012 John Deere 350G-LC Excavator." The record is devoid of any references to whether or not this additional excavator was somehow connected to the Watson drill, whether it was necessary to perform work Dietzel would have performed after Dietzel abandoned the jobsite, or what portion of the invoices could be attributed to the Watson drill. Without such evidence, the finder of fact would be left to only speculate about what damages would be appropriate to award to Wever for the rental of the Watson drill.

As for the rental expenses from United Rentals, the extent of Hisel's testimony on those expenses was that they were incurred "when we started having to rent more support stuff to perform their scope" and that Wever began to incur the expenses in August 2015, which was prior to Dietzel's leaving the project. Hisel did not identify what equipment was rented, for how long Wever rented it, or if all of the equipment was rented for the same period of time. We find no basis in the evidence by which to estimate what portion of these expenses were incurred after Dietzel abandoned the jobsite. Thus, we find that the record does not support awarding Wever damages for equipment rented from United Rentals.

### (ii) "SR-80" Drill

Wever presented evidence that it excavated holes after Dietzel's departure using a rented "SR-80" drill (SR-80). Hisel testified that expenses for the SR-80 after Dietzel left the jobsite amounted to $418,382.62. Dietzel argues that the damages for the SR-80 are unrelated to Dietzel's abandonment of the jobsite. Here, Dietzel presents several points, and we address them in turn.

Dietzel argues that the SR-80 costs are unrelated to Dietzel's abandonment of the jobsite. It contends that MasTec reimbursed Wever for some of the expenses associated with the SR-80 and that the SR-80 was not within Dietzel's scope of work. We disagree. Hisel testified that the only damages she requested for the SR-80 were not reimbursed by MasTec. She

also testified that Wever used the SR-80 to excavate holes after Dietzel abandoned the jobsite. Dietzel also argues that invoices received into evidence demonstrate that Wever rented the SR-80 prior to Dietzel's departure. There are invoices indicating as much, but Hisel testified that she had identified expenses Wever incurred after Dietzel's abandonment.

Finding no merit to Dietzel's arguments specific to the SR-80, we find that the record provided competent evidence by which to conclude that Wever had been damaged by the continued use of the SR-80 after Dietzel abandoned the jobsite. However, because Hisel acknowledged that the requested amount incorrectly added a 20-percent markup rather than one of 15 percent, we adjust the amount for which the evidence supported a damages award accordingly. We find that the evidence would support an award of $400,950.01 for expenses associated with the SR-80.

### (iii) Operators and Administrative Expenses

Wever requested $538,162.50 in damages for what it labeled "Operators Expense" and $234,000 for administrative expenses. Hisel testified that the first category was determined by multiplying 7,174.5 hours by a billed rate of $75 per hour. Hisel testified that this expense was for the additional time "it took [for Wever employees] to run a drill rig" after Dietzel abandoned the jobsite. She also said that she was "trying to recoup[]" money Wever spent on additional hotels, per diems, rental pickups, and other miscellaneous expenses. She testified that the administrative expenses were calculated by multiplying 3,120 hours by a billed rate of $75 per hour. Hisel testified that this expense reflected the additional time Dezort and Dayna Wever spent at the jobsite and that she and other "coordinators" spent managing the project.

Hisel testified that in using the $75 per hour rate, she "was just trying to use a medium range cost that could . . . easily be backed up between the hourly wages and the per diem and the hotels and meals." She testified that Wever billed at $110 per

hour for their superintendents' time and "about $85" per hour for its laborers' time.

Dezort testified that Wever originally planned on a crew of eight people for the project. He also testified that Wever "ended up sticking probably about 3 of our crews on this job" and "the job ended up taking about 6 months longer than it should have." Earlier, Dezort had testified that "[f]or smaller jobs, [Wever] ran about five crews, five guys per crew."

Dietzel argues that awarding Wever damages for operators and administrative expenses requested by Wever would have been clear error, because the evidence was speculative and conjectural. Viewing the evidence in the light most favorable to the Wever, we disagree.

Hisel's testimony about the additional work completed by Wever employees and how she arrived at $75 per hour, if credited, would provide the finder of fact a reasonably certain basis to determine that Wever was damaged and the extent of those damages. Dezort's testimony about the additional man-hours required by Wever employees further supported the existence and scope of the damages. We conclude that the amounts requested for operators and administrative expenses, in the amounts of $538,162.50 and $234,000, respectively, were supported by the evidence. These amounts were not affected by Hisel's calculation error for other damages requested, so these amounts remain unaltered.

### (iv) Auger Purchase

Hisel testified that Wever was forced to purchase an auger after Dietzel abandoned the jobsite and requested damages in the amount of $33,391.78. Dietzel argues that awarding Wever damages for this auger would be clear error, because Wever can still use the auger.

We find there was sufficient evidence to support an award of damages for this expense. Wever offered evidence that it was forced to purchase the auger because Dietzel abandoned the jobsite. Hisel testified that Wever rented equipment unless

it could not do so. Although Hisel acknowledged that Wever still owns the auger, nothing in the record suggests that Wever would have purchased the auger at a later date if it had not been forced to do so by Dietzel's abandonment of the jobsite. Accounting for Hisel's calculation error, we find that the record would support $32,000.46 in damages for the purchase of the auger.

### (v) Remaining Items

Dietzel concedes that Wever presented sufficient evidence regarding several expenses that were attributable to Dietzel's abandonment of the jobsite, including costs associated with an "IMT" drill, moving drill rigs, and "[d]rilling [m]ud." Accounting for Hisel's calculation error, we find the evidence supported a damages award for these expenses in the amount of $217,229.73.

Hisel also testified regarding a number of other expenses to which Dietzel does not present specific arguments on appeal. Therefore, we presume that the record contained adequate support for the district court to award Wever damages for those items. See *Nathan v. McDermott*, 306 Neb. 216, 945 N.W.2d 92 (2020) (to be considered by appellate court, alleged error must be both specifically assigned and specifically argued in brief of party asserting error). These items include expenses for equipment from Jeffrey Machine, "Vac Trucks," "Frac Tanks," steel casing, concrete, and "Teeth." Accounting for Hisel's calculation error, these expenses amount to $308,289.10.

### (vi) Lost Revenue

Hisel briefly testified that Wever lost $1,795,317 in "gross proceeds" because, as a result of Dietzel's breach, it was not permitted to complete its work on a segment of the project. Wever's damages spreadsheet also listed this amount as "Lost Revenue."

Dietzel argues that the district court specifically found that Wever was not entitled to any recovery for the lost segment

of the project. It is not so clear to us that is the case. Dietzel points to the language quoted above in which the district court stated that Wever "failed to prove its claims for lost profit related to future MasTec jobs or other lost profit as proximately caused by Dietzel's breach of contract." That language, however, immediately follows a reference to Wever's claims for lost profits from future work with MasTec or other work it could have completed while finishing this project. Even so, we agree with Dietzel that the evidence did not support an award of damages for the segment of the project Wever was not able to complete.

[16] Hisel asserted in her testimony that if Dietzel's breach had not caused Wever to lose a segment of the project, Wever's "gross proceeds" or "lost revenue" would have been $1,795,317. Wever was not entitled to an award of damages for lost revenue. In a breach of contract case, the ultimate objective of a damages award is to put the injured party in the same position the injured party would have occupied if the contract had been performed, that is, to make the injured party whole. *TNT Cattle Co. v. Fife*, 304 Neb. 890, 937 N.W.2d 811 (2020). An award of lost revenue, however, would have made Wever more than whole, because it would not account for the additional expenses Wever would have incurred to complete the work for which it would have received the lost revenue.

[17] A party can, with adequate evidence, recover lost profits. See, e.g., *Aon Consulting v. Midlands Fin. Benefits*, 275 Neb. 642, 748 N.W.2d 626 (2008). Here, however, Wever's evidence was not adequate. Hisel did not provide any meaningful explanation as to how the $1,795,317 figure for "gross proceeds" was calculated, let alone what Wever's expenses likely would have been to earn those proceeds. A claim for lost profits must be supported by some financial data which permit an estimate of the actual loss to be made with reasonable certitude and exactness. *World Radio Labs. v. Coopers & Lybrand*, 251 Neb. 261, 557 N.W.2d 1 (1996). We note that even Wever appears to recognize the frailty of its claim for an award of

damages for lost revenue associated with the lost segment of the project. On redirect, Wever's counsel asked Hisel what Wever's recovery would be if the lost revenue evidence was completely deficient, and on appeal, Wever does not attempt to argue that its evidence supported an award for lost revenue associated with the lost segment of the project.

### (vii) Summary

Considering each of the above, we find that viewing the evidence in the light most favorable to Wever, the record would support awarding Wever damages for the following expenses in the following dollar amounts:

| Item | Amount |
| --- | --- |
| Operator's Expense | $ 538,162.50 |
| Administrative Expense | 234,000.00 |
| SR-80 | 400,950.01 |
| Watson Drill Return | 4,443.60 |
| Greene Construction | 1,886.00 |
| 90″ Auger Rental | 5,942.63 |
| 90″ Auger Purchase | 32,000.46 |
| IMT Drill | 185,769.85 |
| Moving Drill Rigs | 27,370.00 |
| Drilling Mud | 4,089.88 |
| Jeffrey Machine | 42,006.96 |
| Vac Trucks | 98,673.11 |
| Frac Tanks | 17,940.59 |
| Steel Casing | 66,936.13 |
| 355.89 CY Concrete | 80,626.88 |
| Teeth | 2,105.43 |
| **TOTAL** | **$1,742,904.03** |

Because the evidence would not support the entirety of the damages awarded by the district court, we must reverse that portion of the judgment and remand the cause to the district court with directions to enter judgment in the amount of $1,742,904.03.

## V. CONCLUSION

We find that the district court did not err by rejecting Dietzel's claims of negligent misrepresentation and breach of the implied covenant of good faith and fair dealing. We likewise find no error in the district court's conclusions that Dietzel was not entitled to suspend contractual performance due to Wever's failure to provide adequate assurances and that Dietzel committed the first material breach of the contract.

Because, however, we find that the evidence did not support the entirety of the damages awarded by the district court, we reverse the district court's damages award and remand the cause to the district court with directions to enter judgment against Dietzel and in favor of Wever on Wever's breach of contract claim in the amount of $1,742,904.03 and, taking into account the offset for Wever's unjust enrichment liability, to order that Dietzel is liable to Wever in the amount of $1,414,397.03. In all other respects, the judgment of the district court is affirmed.

Affirmed in part, and in part reversed
and remanded with directions.