WILGRO, INC., A CORPORATION, APPELLEE, v. VOWERS & BURBACK, A PARTNERSHIP, ET AL., APPELLANTS.

208 N. W. 2d 698

Filed June 22, 1973. No. 38717.

O'Brien & Everson and Darrel J. Huenergardt, for appellants.

Wright & Simmons, John F. Wright, and John F. Simmons, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, SMITH, McCOWN, NEWTON, and CLINTON, JJ.

WHITE, C. J.

This is an action for payment of an open account for livestock feed supplement furnished by the plaintiff to the defendants. The defendants counterclaimed for damages, alleging that the plaintiff had breached certain warranties in connection with the nutritional composition of the supplement. The trial court directed a verdict for the plaintiff on the open account and dismissed

defendants' counterclaim for insufficient evidence. We affirm.

Defendant Vowers & Burback is a partnership which has been engaged in the cattle-feeding business since 1951. Between August 6, 1968, and December 21, 1968, the partnership was feeding 1,605 head on its lot in Kimball, Nebraska. The feed consisted of 50 pounds of corn silage and 3 pounds of supplement per head per day, the latter being added in order to increase the cattle's weight gain.

The supplement and the silage were not premixed or stored together. The defendants would spread supplement in the bottom of a feed truck bed and then auger out silage on top of it, approximating amounts by timing the auger. Whatever mixing took place was accomplished by means of "beaters" through which the feed had to pass when it was dumped from the truck into the feed bunks. Since the bunks were open, there was no way to regulate the amount each animal ate. The bunks were merely filled with the total amount of feed needed by all the cattle per day, leaving each animal free to eat the amount it desired.

Since 1966 Vowers & Burback had used feed supplements manufactured by the plaintiff, Wilgro, Inc., and in this case the partners were using the plaintiff's "WIL-GRO-MATIC" as part of a feeding plan recommended by the plaintiff's salesman, Robert Scriven. With each load of supplement, the defendants received a ticket which bore the heading "GUARANTEED ANALYSIS" and which listed the various ingredients used in the supplement's manufacture, together with their percentage amounts. The ticket which accompanied each load of WIL-GRO-MATIC contained, in part, the following listing: "Crude Protein, not less than—32.0% (This includes not more than 14.4% equivalent protein from non-protein Nitrogen.)"

In early October of 1968, approximately 30 days after the animals had been placed in the feed lot, the partners

began to notice problems developing. The cattle were not gaining properly, and their appearance became rough instead of slick and clean. The plaintiff's nutritionist, Dr. James Sprague, made two trips to the lot to inspect the cattle and discuss the problem with the defendants, but he recommended no change in the feeding program. On both occasions he observed that the cattle were being fed silage which was both green and wet, and he took samples of this silage, as well as of the feed, on his second visit. By that time the cattle had been switched to a different feeding program by the defendants, and Wilgro supplement had been replaced by another brand.

Sprague had a laboratory analysis done on the feed and silage samples, and rechecked the results himself. He found that the silage had a comparatively high moisture and protein content and a low grain content, all of which is consistent with immaturity. The supplement was found to have been compounded according to a mathematically erroneous formula. While the amount of non-protein nitrogen (urea) was correct, a decrease in the amount of natural crude protein had made the *percentage* of non-protein nitrogen higher than that listed on the analysis ticket. Thus, whereas the ticket indicated a maximum percentage of 14.4% urea, the supplement samples contained percentages as high as 15.2%. A similar test had earlier been commissioned by the defendants, and it had indicated a urea level of 16.3% in different samples. However, the figure generally used by both parties at trial was 15.2%.

Meanwhile, during the latter part of November and early part of December, 19 of the Vowers & Burback cattle died, and the rest continued to develop behind schedule. More feed had to be purchased because these surviving cattle needed a longer feeding period to reach proper weight.

Defendants retained Dr. Robert Newell, a veterinarian, to inspect and treat the cattle, and to perform autopsies

on the animals which had died. He had dealt with the partners before, and had, in fact, inspected this group of animals when they were placed on the feed lot. He found them to be in good condition at that time. On the morning of December 15, in the presence of two Burback brothers, the autopsies were performed on four head, and it was found that the animals had died as a result of a toxemia condition. Dr. Newell testified that this condition was caused by an abnormal production of carbon dioxide and ammonia in the rumen, resulting from a diet too high in urea. In short, it was Dr. Newell's opinion that the animals died of urea poisoning. He further testified that many of the surviving cattle showed symptoms of what appeared to be toxemia in lesser degrees, and that he treated some of them for this condition.

The record before us discloses no serious dispute concerning the issue of breach of warranty. That an express warranty was made is manifest; the words "GUARANTEED ANALYSIS" can hardly be interpreted as suggesting anything else. Furthermore, much of the evidence of breach of that warranty came from the plaintiff's own witness, James Sprague.

What is in dispute, however, is whether or not the breach was the proximate cause, or even the cause-in-fact, of the injuries sustained by the Vowers & Burback cattle. The narrow issue before us is whether the defendants adduced sufficient evidence in that regard to create a jury question and we hold that they did not.

Defendants cite our holding in Morton v. Travelers Indemnity Co., 171 Neb. 433, 106 N. W. 2d 710 (1960), for the well-established proposition that, for the purposes of evaluating a motion for a directed verdict or a dismissal of a cause of action, all doubt must be resolved in favor of the party against whom the verdict or dismissal is urged. The truth of all evidence he has submitted must be assumed, and he must be given the benefit of all inferences therefrom. The question must

be whether, in view of these assumptions, the jury could properly bring in a verdict in his favor. Lund v. Mangelson, 183 Neb. 99, 158 N. W. 2d 223 (1968).

But even when viewed in this favorable light defendants' evidence is insufficient to support their allegations. A variety of causation theories, all supported in some degree by the record, could account for the toxemia condition which Dr. Newell found. For example, the affected cattle may have ingested feed which was improperly mixed, thus containing more than the recommended 3 pounds of supplement per day. One of the partners admitted that the supplement is merely spread on the bottom of a truck and silage is augered out on top. Perhaps the truck's beaters failed properly to mix a portion of the feed and some of the cattle thus received too much supplement.

On the other hand, the feed could have been properly mixed, but the affected animals might simply have overeaten. The difference in percentage of urea which is alleged to constitute the breach here is slight - approximately 0.8% according to the plaintiff's sample and 1.9% according to the defendants'. If an animal consumed the recommended 3 pounds of properly compounded supplement in a day, it would ingest approximately .432 lb. urea. The same intake of the 15.2% supplement should result in the ingestion of .456 lb. urea. Three pounds of the 16.3% sample would contain .489 lb. urea. This means that an animal which, by virtue of the "free feeding" method employed by the defendants, consumed only 3.167 lbs. of properly compounded supplement in a day would take in the same amount of urea as an animal which ate 3 lbs. of the 15.2% mixture. Furthermore, an animal which consumed only 3.3958 lbs. of properly compounded supplement would take in as much urea as one which ate 3 lbs. of a 16.3% mixture.

That this over-consumption is possible is illustrated

by the following testimony of the defendant Richard Burback:

"Q So, you really don't know whether each animal got three pounds a day or whether he got more than three pounds a day?

"A It was rationed out to them so they would eat three pounds a day, yes.

"Q You mean you put out three pounds a day for every animal?

"A Yes.

"Q If the animal didn't eat his full share that day, he didn't get three pounds?

"A I guess not.

"Q And if some other animal ate more than his share, he got more than three pounds?

"A Most definitely."

Plaintiff also demonstrated that the wet, immature silage, while not causing urea poisoning, could account for some of the symptoms observed in the majority of animals which were not examined.

In short, there are several causative theories which account for the toxemia condition and apparently related symptoms other than the theory urged by the defendants, and in neither of the former theories is the breach of warranty the proximate cause of the injury. In Popken v. Farmers Mutual Home Ins. Co., 180 Neb. 250, 142 N. W. 2d 309 (1966) this court held: "* * * circumstantial evidence is not sufficient to sustain a verdict depending solely thereon for support, unless the circumstances proved by the evidence are of such nature and so related to each other that the conclusion reached by the jury is the only one that can fairly and reasonably be drawn therefrom. * * * The evidence must be such as to make the plaintiffs' theory of causation reasonably probable, not merely possible * * * Where several inferences are deducible from the facts presented, which inferences are opposed to each other, but equally consistent with the facts proved, the plaintiffs do not sus-

tain their position by reliance alone on the inferences which would entitle them to recover. Shamblen v. Great Lakes Pipe Line Co., 158 Neb. 752, 64 N. W. 2d 728." See, also, Haynes v. County of Custer, 186 Neb. 740, 186 N. W. 2d 483 (1971); J. R. Watkins Co. v. Wiley, 184 Neb. 144, 165 N. W. 2d 585 (1969); Guy v. Doeschot, 183 Neb. 557, 162 N. W. 2d 524 (1968); Norcross v. Gingery, 181 Neb. 783, 150 N. W. 2d 919 (1967).

This is not to say that a party who relies on circumstantial evidence for proof of causation must always exclude any other possible causes. Such is not the rule. Fonda v. Northwestern Public Service Co., 138 Neb. 262, 292 N. W. 712 (1940); Petracek v. Haas O.K. Rubber Welders, Inc., 176 Neb. 438, 126 N. W. 2d 466 (1964). But the evidence must be sufficient to fairly and reasonably justify the conclusion that a cause of action has been made out. Howell v. Robinson Iron & Metal Co., 173 Neb. 445, 113 N. W. 2d 584 (1962). As we said in Popken v. Farmers Mutual Home Ins. Co., *supra*: "Conjecture, speculation, or choice of quantitative possibilities are not proof. There must be something more which would lead a reasoning mind to one conclusion rather than to the other."

Thus, while the defendants were not required to exclude every other conceivable cause of the toxemia condition, they were required to adduce some evidence which would lead the reasonable man to accept their theory of causation over those presented by the plaintiff. This they did not do, and their cause of action was properly dismissed.

Since there was no real controversy concerning the plaintiff's cause of action for payment of the account, the trial court's action in directing a verdict in the plaintiff's favor on that issue was equally proper.

The judgment of the District Court is correct and is affirmed.

AFFIRMED.

CLINTON, J., concurs in the result.