MARK DITLOFF AND NANCY DITLOFF, HUSBAND AND WIFE, APPELLANTS, V. STATE FARM FIRE AND CASUALTY COMPANY, A FOREIGN INSURANCE COMPANY, APPELLEE.

406 N.W.2d 101

Filed May 15, 1987.   No. 85-496.

John R. Brogan of Brogan & McCluskey, for appellants.

Daniel M. Placzek of Luebs, Dowding, Beltzer, Leininger, Smith & Busick, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

HASTINGS, J.

Plaintiffs have appealed the order of the district court for York County, Nebraska, overruling their motion for a new trial, which followed the court's order sustaining the defendant's motion for a directed verdict at the close of the plaintiffs' case.

Plaintiffs brought this action against the defendant for payment under their insurance policy for direct loss to their property caused by "[v]andalism or malicious mischief, meaning only wilful and malicious damage to or destruction of property." Plaintiffs alleged in their petition that vandals willfully and maliciously opened the gate on one of their grain trailers, causing corn to flow from the trailer onto the ground.

Some of plaintiffs' cattle ate excessive quantities of that corn and died.

At the end of plaintiffs' case the court directed a verdict for the defendant and dismissed the plaintiffs' case, because it found the plaintiffs had failed to establish a prima facie case of willful and malicious destruction of property. The court then overruled the plaintiffs' motion for a new trial, and this appeal followed.

Although plaintiffs make two general assignments of error, they argue solely in their brief that the district court erred when it took from the jury the issue of whether the loss of their cattle had been caused by vandalism or malicious mischief. Accordingly, we also focus solely on that issue. Because we believe the plaintiffs did establish a prima facie case of willful and malicious destruction of plaintiffs' cattle, we reverse the judgment of the district court.

On Saturday, January 21, 1984, one of the plaintiffs, Mark Ditloff, moved a Big Boxer grain trailer loaded with approximately 175 bushels of shell corn from the home of his parents, George and June Ditloff, to a field on the east side of a north-south gravel road, where 55 head of Mark's cattle were located. The trailer was placed next to the fence which ran alongside the ditch on the east side of the road. Mark's brother, Dennis Ditloff, lived directly across the road to the west.

On Saturday evening the cattle were fed from that trailer by Mark and his father, George. On Sunday George alone fed the cattle. On Monday they both fed them. On Tuesday morning Mark discovered the spilled grain.

The procedure of feeding the cattle involved the use of four buckets which were carried from the Ditloffs' pickup truck. Mark and George parked the pickup on the gravel road adjacent to the grain trailer and then walked across the ditch and over the fence to the grain trailer. They had a washtub which was kept between the grain trailer and the fence. The washtub was placed below the gate on the grain trailer. The buckets were set in the washtub, and when the gate on the grain trailer was opened the corn fell into the buckets, and, if it missed the buckets, it fell into the washtub.

The gate was raised or lowered by turning a wheel on the side

of the trailer. The wheel was located about 3 feet above the ground and was about 1 ½ to 2 feet tall. The gate took "quite a bit of force" to open, and Mark only opened it an inch or so to empty the corn from the trailer. A ratchet could be used to hold the gate open, but the plaintiff never used it because the trailer was rusty and the gate stayed open without the ratchet. Once the feeding was completed the washtub was moved back between the grain trailer and the fence.

Mark testified at trial that on Monday evening he closed the gate on the trailer—that it had to have been closed, otherwise he would have noticed the grain running out when the washtub was moved back. George testified that he closed the gate. It was about 5:45 p.m. when they finished the feeding.

Dennis Ditloff, who lived across the road from the trailer, testified that he was "kind of awakened" at midnight that night when he heard his dog start barking. Dennis sat up in bed, looked out his west bedroom window, and saw his dog. The dog barked for 5 to 10 seconds and then stopped. Dennis could not see the grain trailer from his west window, and he testified that he did not see or hear anyone drive away on the road, nor hear any vehicles moving at all.

At approximately 8 the next morning, Dennis saw a "big pile of corn on the ground under the trailer" and a "bunch" of cattle were up there eating. When Mark got there at 9 a.m. there was a "heavy mat of corn" 'on the ground, with some cattle still eating. Mark cleaned up the spilled corn, went home, and called the veterinarian. Following this, 13 head of cattle died despite the treatment given them by Mark and the veterinarian.

In order to recover upon a policy of insurance of limited liability, the insureds must bring themselves within its express provisions. *Swedberg v. Battle Creek Mut. Ins. Co.*, 218 Neb. 447, 356 N.W.2d 456 (1984). The peril insured against in the present case was loss by vandalism or malicious mischief, defined in the policy as "wilful and malicious damage to or destruction of property." Proof that the loss occurred by any other means would preclude recovery under this provision of the policy.

In reviewing the evidence on a motion for a directed verdict, the party against whom the motion is directed is entitled to have

every controverted fact resolved in his or her favor and to have the benefit of every inference that can reasonably be deduced from the evidence. The question in this case is whether, in view of this assumption, the jury could properly bring in a verdict in the plaintiffs' favor. *Wilgro, Inc. v. Vowers & Burback*, 190 Neb. 369, 208 N.W.2d 698 (1973). In order for the jury in this case to have properly brought in a verdict for the plaintiffs, the plaintiffs needed to present evidence upon which a jury could find that the cattle were destroyed both willfully and maliciously. *Swedberg, supra.*

The plaintiffs recognized that in order to prove whether the gate was opened willfully and maliciously they must prove who the actor was that opened it. They could offer no direct proof of who opened the gate, but they sought to prove that it was some unidentified third person by ruling out the other possible actors, those being the cattle themselves, Mark, or George. If the cattle had opened the gate, coverage would have been properly denied, because animals such as cattle cannot act with the necessary malicious intent. *Stack v. Hanover Insurance Company*, 57 Ala. App. 504, 329 So. 2d 561 (1976). If Mark or George had left the gate open the night before, that act would have been done accidentally, not willfully, and coverage would again have been properly denied.

As we stated in *Anderson v. Farm Bureau Ins. Co.*, 219 Neb. 1, 4-5, 360 N.W.2d 488, 490-91 (1985) (quoting *Popken v. Farmers Mutual Home Ins. Co.*, 180 Neb. 250, 142 N.W.2d 309 (1966)):

> "The plaintiffs may establish their case by circumstantial evidence as well as by direct evidence.
>
> "However, circumstantial evidence is not sufficient to sustain a verdict depending solely thereon for support, unless the circumstances proved by the evidence are of such nature and so related to each other that the conclusion reached by the jury is the only one that can fairly and reasonably be drawn therefrom. Mullikin v. Pedersen, 161 Neb. 22, 71 N.W.2d 485.
>
> "The evidence must be such as to make the plaintiffs' theory of causation reasonably probable, not merely possible.

"In every case, before the evidence is submitted to the jury, there is a preliminary question for the court to decide, when properly raised, not whether there is literally no evidence, but whether there is any evidence upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the burden of proof is imposed. Weston v. Gold & Co., 167 Neb. 692, 94 N.W.2d 380.

"Where several inferences are deducible from the facts presented, which inferences are opposed to each other, but equally consistent with the facts proved, the plaintiffs do not sustain their position by a reliance alone on the inferences which would entitle them to recover. Shamblen v. Great Lakes Pipe Line Co., 158 Neb. 752, 64 N.W.2d 728.

"Conjecture, speculation, or choice of quantitative possibilities are [sic] not proof. There must be something more which would lead a reasoning mind to one conclusion rather than to the other."

See, also, *Raff v. Farm Bureau Ins. Co.*, 181 Neb. 444, 149 N.W.2d 52 (1967).

While we recognize that these statements of the rules regarding circumstantial evidence in civil cases have been viewed as internally inconsistent and perhaps different than the standard applied in criminal cases, see *Anderson, supra* (Krivosha, C.J., concurring in the result), we need not, at this time, address those statements further. This is true because in our opinion the plaintiffs presented direct evidence sufficient for a jury reasonably to have found that the plaintiffs had refuted the two other possible theories of who or what opened the grain trailer. When there is direct evidence sufficient to refute all theories of the cause of damage except the one established solely by circumstantial evidence, there then remains but one inference deducible from the facts under the circumstances, and it is within the province of the trier of fact to make this determination.

To refute the theory that the cattle may have rubbed against the wheel, thereby opening the gate, the plaintiffs presented evidence that the gate itself, which was about 3 feet off the ground, was rusty. Mark testified that, as a result, it took "quite

a bit of force" to open and that it would take the strength of a "man to do it; it opened that hard." George Ditloff testified that it took all of his power to open it and that he often would have Mark help him get it open. He also testified that he had trailers in with cattle at the south farm and that they were never opened by cattle. Mark testified that they had had that particular grain trailer for about 9 years and had never experienced an incident where cattle could get the gate open. He also testified that cattle usually only rub their heads and bodies against things when they have lice and grubs. These particular cattle had all been wormed and poured in November. Finally, Mark testified that when he first saw the corn on the ground it was in a radius like a half moon out in front of the trailer. He stated that cattle usually moved in bunches; consequently, if one had opened the gate, they would have been able to keep up with the grain pouring out of the trailer and there would have been no such mound of corn. At the time he arrived there that morning, cattle were still eating the corn.

From this evidence we believe it would not have been mere speculation for a jury to believe that the cattle did not open the gate on the grain trailer.

To refute the theory that Mark or George accidentally left the gate open on the grain trailer when they were feeding the cattle the previous evening, the plaintiffs presented evidence that the gate was closed when they left that evening. Although there was some dispute about who actually shut the gate, with George testifying that he closed it and Mark looked at it too, and Mark testifying at trial that he closed it but testifying in a previous deposition that his father closed the gate, both were positive that the gate was shut. As Mark stated: "You got to bend down to pick up the tub right in front of the gate and if it had been running it would have been noticeable." Mark also testified about the amount of grain in the trailer and the rate at which the grain would fall out of the gate. He stated that they had filled the trailer up 3 days before the spillage, that the trailer held around 175 bushels (which equals 1,400 gallons) when full, and that they had fed the cattle approximately 135 gallons of feed so far from the trailer. The night before the spillage they opened the gate about 1 inch and fed the cattle 55 gallons of feed,

completing the feeding in approximately 15 minutes. The next morning the gate was open less than an inch and the level of corn had fallen only about 18 inches to 2 feet. If Mark and George could feed 55 gallons of feed in 15 minutes with the gate open approximately 1 inch, it is obvious that had the gate been left open, even only half of an inch, from 6 p.m. until 9 a.m., there would have been no grain left in the trailer at all.

From this evidence it would not have been mere speculation for a jury to believe that Mark and George did not leave the gate open on the grain trailer.

This leaves the plaintiffs with their theory that some third party opened the gate on the grain trailer. Although Dennis Ditloff's testimony about hearing his dog barking in the middle of the night lends some credence to the third-party theory, we believe that the plaintiffs' refutations of the other possible actors raised sufficiently the theory that some unidentified person opened the grain trailer. Because the grain trailer was parked in a fenced-in field, and because it was so rusty that opening it was quite difficult, a jury could also properly have found that some unidentified third party opened the gate willfully. However, whether a jury could properly find that this unknown person engaged in "malicious damage to or destruction of property" is a more troublesome question.

In *Swedberg v. Battle Creek Mut. Ins. Co.*, 218 Neb. 447, 451, 356 N.W.2d 456, 459 (1984), malice was defined as " 'intention or desire to harm another usu. seriously through doing something unlawful or otherwise unjustified' " (citing Webster's Third New International Dictionary, Unabridged 1367 (1968)). After defining malice, we then wrestled with the question of whether intent of doing harm could be presumed from the mere act of placing poison in an area which had previously been used to dump other debris. We determined it could not, but went on to state:

> Certainly, if a can of poisonous substance is placed on the front steps of a home or near the feeding troughs of livestock, both places where one would not expect to find such a substance, the intent of doing harm may be presumed and malice established by reason of the act of placing the poison.

218 Neb. at 451, 356 N.W.2d at 460. Thus, we recognized that malice can in certain situations be presumed from the mere doing of an act, not that it could never be presumed.

The question in this case is whether intent of doing harm can be presumed from the fact that some unauthorized person opened the gate on a grain trailer and let grain spill to the ground in a field in which cattle are grazing. Unlike the situation in *Swedberg*, where we determined that the placement of the poison in an area where other junk had been dumped evidenced possible negligence or carelessness on the actor's part, it would not appear that opening up a grain trailer under these circumstances could have been a merely negligent or careless act. What motivation, other than ill will toward the owner of the grain, could account for someone's going through the trouble of crossing the plaintiffs' fence and deliberately turning the rusty wheel on their grain trailer, causing grain to spill out on the ground?

An answer to this query may be found in *Burgess Farms v. New Hampshire Ins. Group*, 108 Idaho 831, 702 P.2d 869 (1985).

> A growing number of courts, on the other hand, do not limit the definition of malice to "an intent to damage or destroy." These courts have adopted a broader definition which includes acts done with such reckless and wanton disregard for the rights of the property owner as to be the equivalent of intent. [Citations omitted.] In *Frontier Lanes v. Canadian Indemnity Co.*, 26 Wash.App. 342, 613 P.2d 166, 169 (1980), *overruled in part, on other grounds, Graham v. Public Employees Mutual Ins. Co.*, 98 Wash.2d 533, 656 P.2d 1077 (1983), it was held that "[p]roperty has been damaged 'willfully and maliciously' [contract language] if the damage results from an intentional act from which damage was *reasonably expected to result*." (Emphasis added.) In *Hatley v. Truck Ins. Exchange*, 494 P.2d at 431, the Oregon court held that "property has been damaged 'willfully and maliciously' [again, contract language] if the damage results from an intentional act from which damage *manifestly would or could result*." (Emphasis added.) . . .

A person, under this broader standard, need not intend a specific type of damage to specific property. It is enough that damage of some kind to some property should or could have been expected to result from the intentional act.

*Id.* at 833-34, 702 P.2d at 871-72.

We adopt the reasoning of the Idaho court and hold that malice may be presumed from an intentional act if damage of some kind to some property should or could have been reasonably expected to result from such act. This presents a question of fact in this case, and a finding of malice from the act of deliberately opening the grain trailer under these circumstances would not have amounted to mere speculation by the jury. See, also, *Hunter v. Nat. County Mut. Fire Ins. Co.*, 687 S.W.2d 110 (Tex. App. 1985) (sudden appearance of dirt directly in the lubricating oil of a truck implies both a human agency and, since no other reason can be perceived for the putting of dirt in an engine, that the human agency acted deliberately and with malicious intent).

We therefore reverse the judgment of the district court and remand the cause for further proceedings consistent with this opinion.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.

KRIVOSHA, C.J., concurs in the result.