IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

ROLLING MEADOW RANCH V. FARM BUREAU PROP. & CAS. INS.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

ROLLING MEADOW RANCH, INC., APPELLANT,

V.

FARM BUREAU PROPERTY AND CASUALTY INSURANCE, INC., AND
WESTERN AGRICULTURAL INSURANCE COMPANY, APPELLEES.

Filed December 3, 2024.    No. A-23-851.

Appeal from the District Court for Sheridan County: TRAVIS P. O'GORMAN, Judge. Affirmed.

Todd R. McWha and Jonathan S. Peiffer, of Waite & McWha, for appellant.

Steven W. Olsen, of Simmons Olsen Law Firm, P.C., L.L.O., for appellees.

RIEDMANN, Chief Judge, and MOORE and WELCH, Judges.

MOORE, Judge.

INTRODUCTION

Following a diesel fuel leak from a fuel tank for the furnace at its office building in Hay Springs, Nebraska, and denial of the resulting insurance claim for damage to the building, Rolling Meadow Ranch, Inc., sued Farm Bureau Property and Casualty Insurance, Inc., and Western Agricultural Insurance Company (collectively "Farm Bureau") in the district court for Sheridan County for breach of the insurance policy covering the building. The district court found that Rolling Meadow did not prove that the damage was covered under the policy, found in favor of Farm Bureau, and dismissed the case. Rolling Meadow appeals. We affirm.

- 1 -

STATEMENT OF FACTS

On July 1, 2019, Rolling Meadow employee Linda Fedderson noticed a strong smell of diesel fuel inside the building when she arrived at the office. She contacted Westco, the company that provided fuel for the fuel tank in the crawl space below the building. Nick Streblow, the Westco employee who investigated, found the ground soaked with diesel and some components of the fuel filter assembly on the ground. The fuel oil tank, which had last been filled on April 1, was empty. Rolling Meadow moved to a different office space in Rushville, Nebraska, at some point later in July. A subsequent appraisal of the Rolling Meadow's Hay Springs property, with a valuation date of July 8, 2019, valued the "Office and Land Only" before the diesel leak at $79,000; the "Whole Property" before the leak at $93,000; and the "Property . . . whole or office only" after the leak at $0.

The insurance policy at issue provides that Farm Bureau:

Will not pay for loss or damage caused by or resulting from the discharge, dispersal, seepage, migration, release or escape of 'pollutants' unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the 'specified causes of loss'. But if the discharge, dispersal, seepage, migration, release or escape of 'pollutants' results in a 'specified cause of loss', [Farm Bureau] will pay for the loss or damage caused by that 'specified cause of loss'.

"Pollutants" is defined in the policy as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and wastes." The policy also states, "Waste includes materials to be recycled, reconditioned or reclaimed." "Specified Causes of Loss" is defined to include:

Fire; lightning; explosion; windstorm or hail; smoke, including the emission or puffback of smoke, soot, fumes or vapors from a boiler, furnace or related equipment; aircraft or vehicles; riot or civil commotion; *vandalism*; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

(Emphasis supplied.) The policy provides a coverage limit for the office building of $85,500.

On about July 8, 2019, Rolling Meadow made a claim under the insurance policy for loss resulting from the diesel leak, and on July 19, Farm Bureau denied the claim based on its determination that the cause of loss remained unknown.

Steven R. Hamers, a forensic engineer, investigated the diesel leak on behalf of Farm Bureau, and visited the site on July 23, 2019. At that time, Hamers made certain visual observations, but he was unable to remove the fuel filter assembly to perform a more thorough examination because Rolling Meadow's owner, Andrew Machata, did not want Hamers to remove any evidence from the loss site until Machata had contacted his attorney and an engineer. In his first report, dated July 27, Hamers concluded:

Based on the information I have to date and based on the examinations completed to date, the fuel oil leak in the crawl[ ]space of the [office] was caused by the fuel oil filter bowl separating from the filter head. In order to separate the fuel filter bowl from the filter head,

the center bolt or the bowl bolt must be unthreaded from their respective connections. Since the fuel filter was last replaced in February[] 2019 and the furnace operated without issue until June, the filter bowl did not separate from the filter head until sometime after . . . Fedderson stopped using the heat. However, at this time, the cause of the unthreaded connection has not been determined.

On August 6, 2019, Farm Bureau again denied the claim, stating in a letter to Rolling Meadow that its investigation had found that the fuel leak was not caused by any of the specified causes of loss defined by the policy and that all specified causes of loss were reviewed and considered but ruled out based on Farm Bureau's investigation.

Rolling Meadow contacted the Sheridan County sheriff's department on September 16, 2019, to report possible criminal mischief in connection with the fuel leak. The deputy sheriff who investigated did not see any signs of vandalism. The deputy spoke with several individuals, including Fedderson and Streblow. The deputy noted in his report that when Streblow responded to Fedderson's call in July, he found that "the fuel filter had come off." Streblow also reported to the deputy that he "tried to put the fuel filter back on the line but the bolt or nut was so warn [sic] out that it would not go back on." The deputy concluded, "At this time it appears that the fuel filter nut or bolt was warn [sic] out and had come loose."

On November 7, 2019, Rolling Meadow's attorney sent a letter to Farm Bureau, asserting that the construction of the fuel oil filter housing was such that it must have been intentionally disassembled, arguing that the diesel leak was caused by vandalism, a covered cause of loss, and asking Farm Bureau to reconsider its denial of coverage.

On November 18, 2019, Farm Bureau issued its final denial letter, stating that it had reviewed the information provided in the November 7 letter from Rolling Meadow's attorney, including the incident report from the investigation by the sheriff's department, and that it was standing by its original disclaimer of coverage.

On August 3, 2020, Rolling Meadow filed a complaint in the district court, alleging that its loss was covered under the insurance policy issued to it by Farm Bureau and that Farm Bureau had breached its obligations under the policy by denying coverage. Rolling Meadow sought judgment for $85,500 (the policy limit for the office space on the insured property) plus additional damages to be determined, as well as attorney fees, prejudgment interest, and costs.

Farm Bureau answered, denying that the insurance policy provided coverage for the claim submitted by Rolling Meadow.

A bench trial was held before the district court on August 1, 2023. The court heard testimony from the owner of the company that serviced the furnace, Streblow, a Rolling Meadow employee, the owner of an auto parts store, and Hamers. The court received exhibits including depositions from Fedderson (who had died by the time of trial) and Machata (who lives in Florida); numerous photographs of the fuel filter assembly parts and crawl space; the insurance policy and denial of coverage letters; Hamers' investigation reports; and various other reports, statements, and documents. In addition to the evidence already summarized above, we further summarize the evidence as follows.

The crawl space below the office building is accessed through a small door on the side of the building. The crawl space is about 4 feet deep. The door does not have a lock but is secured by

"a little quick latch that folds over . . . a D-ring" and a clip "like the end of a dog leash." The crawl space has a dirt floor, and the fuel tank is located "immediately off to [the] left" from the entrance to the space. The fuel filter assembly consists of the filter head, filter, filter bowl or canister, long center bolt, lower filter cone bolt, and a small lower bolt. The long center bolt inserts from the top of the filter head into and through the filter, which rests in the filter bowl. The cone bolt/nut (also inside the filter bowl) rests at the bottom of the filter and is used to secure the filter to the long bolt. The small lower bolt is inserted from the bottom on the outside of the bowl and screws into the bottom of the cone bolt to secure the bowl to the fuel filter assembly. There are several gaskets in the assembly that "help avoid leakage." A pipe runs from the tank and connects to the fuel filter assembly on one side of the filter head. A copper fuel line connects on the other side of the filter head and runs from the assembly to the furnace. When the fuel filter assembly is fully assembled and attached to the pipe and fuel line, the bottom of the assembly is "close to" the floor of the crawl space, only about 1 or 2 inches from the ground.

There was evidence about use and servicing of the furnace and refilling of the fuel tank prior to the leak. Scott Diehl, the owner of MPC Heating and Cooling, testified about work he performed on the fuel oil furnace at the Rolling Meadow office. In November 2018, MPC was called to the office due to "[n]o heat." On November 13, MPC replaced the furnace air filters, cycled the heat, and the furnace "cycled properly." On January 22, 2019, MPC responded to another service call of "[n]o heat." MPC ordered new electrodes and a transformer to address the issue, returning on February 5 to install those parts. At that time, MPC also replaced the oil pump, oil filter, and oil nozzle. According to Fedderson, the furnace then operated without further issue for the rest of the winter. Fedderson stated that it was a "very cold spring." She recalled operating the furnace during the month of June.

Invoices from Westco show that it delivered 217 gallons of fuel oil on March 6, 2019, and 163 gallons on April 1. The April delivery was the last prior to the discovery of the fuel leak in July. Streblow confirmed these delivery dates in his testimony.

Fedderson was asked about the report of vandalism made to the sheriff. She did not recall sharing any evidence of vandalism at the time of the sheriff's investigation, testifying simply that vandalism was "the only possible solution" and that the lower bolt "would not have just come out" but "had to be taken out." She confirmed, however, that she had no indication of who may have removed the bolt. She testified that other than the fuel leak incident, she was not aware of any acts of vandalism to Rolling Meadow's property. According to Fedderson, most people would not even know about the crawl space beneath the office. Fedderson was not aware of anyone other than employees of Rolling Meadow, Westco, or MPC, ever accessing the crawl space, and she did not recall the crawl space being left open other than once "because of the wind."

Other witnesses confirmed that there were no direct signs of vandalism. Streblow testified that he did not see any signs or evidence of vandalism when he was called to the property to investigate, although he stated that he was not really looking for signs of vandalism. He confirmed, however, that he did not see anything that was different from the last time that he delivered fuel to the property other than the parts and fuel on the ground. Streblow also confirmed that the door to the crawl space was always closed when he delivered fuel, that he always closed the door when he was finished, and that it never appeared that other people had been in the crawl space. Similarly, Diehl indicated that when servicing the furnace at the office, the crawl space door was always

closed when he arrived and that he always shut it when he left. And, in his deposition, Machata testified that there had been no other incidences of vandalism in the basement where the furnace was located. The only possible vandalism on the property was an incident in which someone drove on some gravel or decorated rock on the property. Machata did not know of or have any suspicions as to who would have "unscrewed the filter and dumped all the fuel into the bottom of the crawl[ ]space."

Diehl testified about the process of changing the oil filter in February 2019. He was asked if he removed the "bottom outside bolt" at that time, and he replied that he had "never removed one of these bolts" because "to access the filter, you just take the top part off." He noted that "a lot of filter canisters don't even have a bottom bolt." Diehl indicated that when changing the filter, he checks to make sure it is not leaking fuel and that the filter in question was not leaking in February 2019. Diehl was asked about the cone bolt on the filter in question which appeared to have "almost an oval shape," like it had "been pinched together." Diehl testified that he had never seen it because he had never removed that component from a filter canister before and did not know whether it was "supposed to be like that." He again confirmed that he did not unscrew the bottom bolt in February 2019.

Diehl was asked questions about how the filter components might have come apart in the way observed by Streblow when he investigated in July 2019. Diehl confirmed that if the bottom bolt "popped off," the outside canister would drop, testifying that that would "create a substantial [leak]." He was asked about vibration issues. He testified that he did not think the "small amount of vibration" from the pump in the furnace was sufficient to "really loosen threads" with the 4-6 feet of copper tubing between the filter and the furnace. He also stated that he had "never seen one vibrate loose" and had "never seen a canister come apart." He testified that on occasions when he was called to a facility to service leaks, "usually it's a fitting" or "a gasket going bad between the top part of the filter and the canister." Diehl indicated that for the filter to be on the ground at the time Streblow investigated in July 2019, the cone bolt would have had to have "c[o]me apart on both sides." He agreed that the cone bolt could be unscrewed from the top bolt. He testified that if the lower bolt "was loose from the cone," that "it would leak." Diehl noted that the filter is not pressurized and that the only pressure on the filter is "the weight of the fuel in the tank." Diehl did not think that pressure from the tank would be sufficient to bend "the last thread" and cause the lower bolt to pop off. He testified that if there was a "small leak" from a loose lower bolt after he replaced the filter in February, the furnace could have continued to run, but that if the furnace had been leaking during the remaining period of use in 2019, someone would have smelled it before July.

In their testimony, both Diehl and Casey T. Walton, the owner of an auto parts store, agreed that there was damage to the threads of the lower bolt as well as to the filter cone. They were asked to look at the filter cone at trial and based on their observations at that time, they acknowledged that the lower bolt had come loose from the cone at some point in the past and that someone had tried to reinsert it into the cone by using pliers or some other tool to hold the cone. Diehl was asked about how the damage to the cone might have occurred "if [he] didn't do it," and he noted that the filter assembly "ha[d] been there for 50 years." Walton, who inspected the site after the leak, did not see any signs of vandalism, but speculated that "[s]omebody could've stole fuel." When asked whether someone wanting to steal fuel would "reassemble things for the owner," he speculated

about the possibility of "some drunk cowboy from the bar that didn't have enough fuel to get home," going into the crawl space with "his cell phone for a light and a socket set." He also stated, "We don't know."

A Farm Bureau representative recorded telephone interviews with several individuals in July 2019, as part of its investigation. In his interview, Streblow reported that when he investigated the leak, he found that "the filter casing . . . had popped off the filter head and was laying straight below it." When he "examined what had happened, why the filter had come off," he found that "the bolt that holds the filter casing on the bottom side had popped out, and . . . the last couple threads on it were all screwed up" so that he "couldn't get 'em to thread into the nut." Since he assumed Rolling Meadow was "still gonna use that system" and because there was no one around for him to speak with, he "just took the . . . nut and bolt down to the station . . . and got the threads cleaned up on that, so they could be used again." He then returned the next day and talked with Fedderson. At that time, he gave Fedderson "the bolt and the nut." Upon inquiry by the Farm Bureau representative, Streblow confirmed that "the short little bolt or the bleeder valve on the bottom of that nut . . . was also separated" and stayed on the ground right below the filter head when he picked up the filter "casing."

At trial, Streblow testified that when he entered the crawl space to investigate the fuel leak, he found the filter head in place with the center bolt still attached. He found the filter bowl, filter, filter cone, and lower bolt, all on the ground below the filter head. He recalled the filter still being inside of filter bowl at that point; he could not see the filter cone. At trial, when questioned about his previous statements that did not reference the location of the filter cone, he stated that he did not recall, for sure, where the cone was. Streblow confirmed that the small lower bolt had "popped out," and he testified that he found it on the ground separated from the other parts.

Streblow tried to screw the lower bolt back into the cone but was not able to do so. He testified that it "acted like it wanted to start threading but then it caught," which was when he discovered that "the last couple of threads were bent over." When he examined the components more closely, he took the filter out of the canister, which was when he found the cone nut. Streblow then took the cone nut and lower bolt back to his workplace, where he "filed the bad spot out of the threads [on the lower bolt] so it would thread in." Streblow also cleaned the threads with brake cleaner. He was then able to thread the lower bolt back into the cone. Streblow confirmed that he returned the filter cone and lower bolt to Fedderson the following morning.

In contrast to his trial testimony, in an affidavit dated January 18, 2022, Streblow stated that he was unable to reattach the filter components to the filter head "because the small lower bowl bolt was dirty." He also stated that "[t]he only way for the fuel filter housing and fuel filter to come unscrewed would have been because somebody physically unscrewed it" and that the filter and housing "are not in an area that would receive any vibration from the fan unit." Finally, he stated that even if it received vibration "with the bolt tightened as [he] had last left it, it would not have come off other than if someone physically unscrewed it."

After Rolling Meadow rested, Farm Bureau made a motion for directed verdict, which was denied by the district court. Farm Bureau then presented testimony from Hamers, who testified generally consistent with the opinions expressed in his supplemental written report, that the diesel leak was caused by a mechanical failure, rather than vandalism. In Hamers' supplemental report, dated January 11, 2023, he detailed his observations and opinions after review of additional

documentation and further examination of the filter assembly components. Hamers did not unthread the lower bolt to observe its threads in July 2019 at Machata's request. Upon examining the lower bolt in November 2022, he observed that "someone, likely . . . Streblow based on his statements in the Farm Bureau interview, fixed the damaged lower threads on [it] with a metal file or similar tool." He found this damage to the threads "of particular importance," stating in his report, "If only the lower couple of threads were 'all screwed up', then there is no way that the lower bowl bolt was tightly threaded into the lower filter cone at the time of the failure." He also noted the condition of the outer ring on the filter cone bolt, which was "bent inward at two locations," indicating that "someone tried to retighten the lower bolt, bowl and lower filter cone assembly after it had come loose." He noted that there is "nowhere to put a wrench on the lower filter cone so the only way to hold it in a fixed position is with pliers or a similar tool which then bent the outer ring of the filter cone." Hamers conducted various tests on an "exemplar fuel oil filter" he purchased from eBay in November 2022, noting that "[d]uring manufacturing, the lower filter cone [of the exemplar] was permanently attached to the bowl with the lower bolt and a glue or lock-tight thread sealer that was supposed to prevent the lower bolt from separating from the bowl and lower filter cone." He also noted that on the exemplar, the outer ring of the lower filter cone was round. Based on his tests and the condition of the components of the filter in question, Hamers concluded, "If the lower bolt became loose again and a technician did not observe that the lower bolt was loose, it is possible to incorrectly reassemble the filter housing with a new filter and leave the lower bolt loose enough to fail at a later date." He concluded further:

> Based on this scenario, the lower bolt connection could fail due to temperature variations or vibrations from truck traffic across the scale at the loss location. Assuming this was the pre-failure condition, then all of the evidence is accounted for since only a couple of threads on the lower bolt were observed [by Streblow] to be damaged. . . . The lower filter cone had previously been damaged while trying to reassemble the cone to the lower bolt which indicated that the lock-tight on the lower bolt had failed previously. Once this condition was recognized by someone replacing the filter, the entire filter bowl should have been replaced since the bowl, lower cone and bottom bolt are intended to be one permanently affixed assembly.

Hamers set forth the following opinions and facts, which he found did not support a theory that fuel oil filter was disassembled in an act of vandalism:

> 1. In order to disassemble the filter housing in a manner in which it was found, the vandal would have to remove the center bolt, then use a pliers or similar tool to hold the center cone and then remove the lower bolt but then thread the lower cone back onto the center bolt after the fuel was flowing out of the tank.
>
> 2. As observed during the exemplar testing, if the lower bolt is turned counterclockwise (loosened), the filter housing will unthread from the center bolt and not from the connection between the lower bolt and the lower filter cone.
>
> 3. If a vandal was attempting to steal the fuel and they had the tools necessary to disassemble the filter housing as it was found, then it makes more sense to disassemble the copper line to make collecting the fuel in a fuel can much easier. When the filter housing

is removed, fuel will run all over rather than into a fuel can because there is no spout or pipe for the fuel to run out of.

4. Mr. Streblow indicated that he found the fuel filter housing 'laying straight below' the filter head. If a vandal was attempting to collect the fuel from the leak, then they would have moved the fuel filter housing away in order to collect the fuel in a container.

5. There was very little clearance between the ground and the filter head for a container to be placed to collect the fuel. There was a copper line attached to the fuel tank that could have easily been removed from the furnace and then the fuel would have been easy to collect in a fuel can.

6. The fact that . . . Streblow observed that the threads on the lower bolt were damaged indicates that the threads slipped out of the lower filter cone and that they were not unthreaded from the lower cone.

Hamers opined, based on his analysis of the available evidence and his experience, education, and training, as follows:

1. The filter bowl separated from the filter head at a connection that was intended to be permanently fixed together.

2. The failure of the permanent connection occurred at some previous time as was indicated by the attempted repair to reattach the lower bowl bolt to the lower filter cone.

3. Once the permanent connection had failed, the entire fuel filter bowl assembly should have been replaced rather than attempting to reattach the components.

4. The lower bolt and lower filter cone were likely loose at the time of the last filter change.

5. The technician did not recognize the loose condition of the lower bolt connection during the last fuel filter change.

6. Since it was loose, the lower filter cone threaded further onto the center bolt rather than the lower bolt which caused limited thread engagement with the lower bolt.

7. The limited thread engagement between the lower bolt and the lower filter cone was confirmed by the damaged threads on the lower bolt observed by Streblow.

On October 6, 2023, the district court entered an order finding in favor of Farm Bureau and dismissing Rolling Meadow's complaint with prejudice. The court noted that there was no dispute that the insurance policy would provide coverage if vandalism was the cause of the diesel leak from the oil filter. However, the court found that Rolling Meadow did not carry its burden of proving that its claim was within the limitations of the policy. The court noted Hamers' inspection of the oil filter in November 2022, stating that it found Hamers' testimony "credible and persuasive." The court determined that Hamers established what caused the leak, finding:

The oil filter was approximately 50 years old at the time of the leak. Hamers determined that there was damage to the lower bolt and also the cone. The damaged parts revealed that the lower bolt had come loose at some undetermined time in the past. Someone tried to screw it back into the cone. It came loose again resulting in the leak.

The district court found no evidence of vandalism or theft. In support of this finding, the court noted the testimony of Streblow and Fedderson, as well as the investigation by the Sheriff's Department, that there were no signs of vandalism and had been no acts of vandalism on the property. The court found that Walton's testimony eliminated "[a]ll of the mechanisms of doing something intentional to the fuel filter" as possible causes of the leak. The court also noted Walton's response when asked about "any other options for the theft of fuel," and it rejected Walton's suggestion that "some drunk cowboy from the bar may have stolen some fuel," finding no evidence that this occurred.

The district court again stated that Hamers determined the cause of the leak, finding that the failure of the fuel filter and the subsequent leak resulted from use and the damage to the lower bolt and cone and that there was no evidence the leak was caused by vandalism or theft. Accordingly, the court determined that there was no coverage under the insurance policy at issue, found in favor of Farm Bureau, and dismissed the complaint.

ASSIGNMENTS OF ERROR

Rolling Meadow asserts that the district court erred in (1) disregarding Rolling Meadow's circumstantial evidence in support of an act of vandalism and (2) reaching its determination based on the irrelevant consideration of theft.

STANDARD OF REVIEW

A suit for damages arising from a breach of contract presents an action at law. *Dietzel Enters. v. J. A. Wever Constr.*, 312 Neb. 426, 979 N.W.2d 517 (2022).

In a bench trial of a law action, a trial court's factual findings have the effect of a jury verdict and will not be set aside on appeal unless clearly wrong. *Id.* After a bench trial of a law action, an appellate court does not reweigh evidence, but considers the evidence in the light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party. *Id.*

ANALYSIS

Rolling Meadow assigns that the district court erred in disregarding Rolling Meadow's circumstantial evidence in support of an act of vandalism and reaching its determination based on the irrelevant consideration of theft. Essentially, it asserts that the court erred in ruling in favor of Farm Bureau and finding Rolling Meadow did not meet its burden of proof with respect to its breach of insurance contract claim.

When asserting a breach of an insurance contract, the plaintiff has the burden of bringing his claim within the limitations of the policy. *Rohde v. Farmers Alliance Mut. Ins. Co.*, 244 Neb. 863, 509 N.W.2d 618 (1994).

In presenting its argument on appeal, Rolling Meadow acknowledges that under the applicable standard of review, the district court's factual findings will not be set aside by this court unless clearly wrong. It argues, however, that the standard of review "is not an absolute bar to appealing factual findings." Brief for appellant at 10. Rolling Meadow argues that it presented sufficient circumstantial evidence to prove that the diesel leak was caused by vandalism, which the district court disregarded in favor of Farm Bureau's "fatally flawed theory" that the diesel fuel

leak was caused instead by mechanical failure. Brief for appellant at 11. In support of its argument, Rolling Meadow draws our attention to *Ditloff v. State Farm Fire & Cas. Co.*, 225 Neb. 375, 406 N.W.2d 101 (1987), and *Rohde v. Farmers Alliance Mut. Ins. Co., supra*.

In *Ditloff*, the plaintiffs sought payment under their insurance policy for the loss of some cattle. The insurance policy covered losses due to vandalism or malicious mischief, defined in the policy as willful and malicious damage to or destruction of property. The insurer denied coverage, and the plaintiffs sued, alleging that vandals had willfully and maliciously opened the gate on their grain trailer, allowing corn to flow onto the ground, resulting in some of their cattle dying from eating an excess of corn. At trial, the plaintiffs did not offer direct proof of who opened the gate; rather, they sought to prove that that gate was opened by an unidentified person, by ruling out other possibilities, such as the individuals who fed the cattle or the cattle themselves. The trial court found that the plaintiffs failed to establish a prima facie case of willful and malicious destruction of property, granted a directed verdict in favor of the defendant, and dismissed the case.

The Nebraska Supreme Court reversed the grant of the directed verdict, finding that the plaintiffs had established a prima facie case of willful and malicious destruction of their cattle. In other words, they presented sufficient direct evidence to refute the possibility that the gate was opened by the cattle or the individuals who fed them. In examining the evidence, the Supreme Court noted that circumstantial evidence is not sufficient to sustain a verdict depending solely thereon for support, unless the circumstances proved by the evidence are of such nature and so related to each other than the conclusion reached by the jury is the only one that can fairly and reasonably be drawn therefrom. *Ditloff v. State Farm Fire & Cas. Co., supra*. The evidence must be such as to make the plaintiffs' theory of causation reasonably probable, not merely possible. *Id.* Where several inferences are deducible from the facts presented, which inferences are opposed to each other but equally consistent with the facts proved, the plaintiffs do not sustain their position by a reliance alone on the inferences which would entitle them to recover. *Id.*

The Nebraska Supreme Court in *Ditloff* confirmed that conjecture, speculation, or choice of quantitative possibilities is not proof. *Id.* Rather, there must be something more which would lead a reasoning mind to one conclusion rather than to the other. *Id.* The Court further stated that when there is direct evidence sufficient to refute all theories of the cause of damage except the one established solely by circumstantial evidence, there then remains but one inference deducible from the facts under the circumstances, and it is within the province of the trier of fact to make this determination. *Id.*

There was evidence in *Ditloff* about the mechanism by which the trailer gate could be opened, the force required to do so, the condition of the plaintiffs' cattle, the behavior of cattle in general, and the way the corn was arrayed on the ground when discovered. There was also evidence about the actions of the individuals who fed the cattle the evening before, the position of the gate the next day, the amount of grain in the trailer before and after the incident, and the way grain typically fell from the trailer. After examining the plaintiffs' evidence, the Supreme Court concluded that it would not have been mere speculation for a jury to believe that the cattle did not open the gate and that the individuals who fed the cattle did not leave the gate open. The Supreme Court concluded that the refutation of the other possibilities sufficiently raised the theory that the trailer was opened by an unidentified third person. The Court also concluded, based on the

evidence about the location of the trailer and the condition of the gate, that a jury could have properly found that an unidentified third person willfully opened the gate.

Next, the Supreme Court examined the question about whether a jury could have properly found that the unknown person engaged in malicious damage to or destruction of property. The Court held that malice may be presumed from an intentional act if damage of some kind to some property should or could have been reasonably expected to result from such act, which presents a question of fact for the jury. See *id.* The Court concluded that a finding of malice from the act of deliberately opening the grain trailer under the circumstances presented in *Ditloff* would not have amounted to mere speculation by the jury. Accordingly, the Supreme Court reversed and remanded for further proceedings.

In *Rohde v. Farmers Alliance Mut. Ins. Co.*, 244 Neb. 863, 509 N.W.2d 618 (1994), the plaintiffs filed suit in county court for breach of contract after their insurance company denied coverage under a policy provision covering vandalism or mischief. The plaintiffs' center-pivot irrigation system suffered damage after being lubricated with oil contaminated by water. There was evidence about the servicing of the center-pivot unit in question and the plaintiffs' other units, the use of the particular drum of oil, the location where the oil drum was kept, and the eventual damage to the unit in question. The individual who repaired the unit testified that it was damaged due to lubrication with water-contaminated oil. The oil in the drum was tested, and there was evidence about the level of contamination. There was also evidence that it was unlikely that the water contamination was caused by condensation. The county court granted the insurer's motion for directed verdict, finding the evidence insufficient as a matter of law to support the plaintiffs' claim. The plaintiffs appealed to the district court, which reversed and remanded for trial on the merits.

The Nebraska Supreme Court examined the insurer's contention that the district court erred in remanding for trial on the merits because the plaintiffs failed to present sufficient evidence that the water contamination of the oil resulted from an intentional, malicious act and was thus covered under the vandalism or mischief clause of the insurance policy. The Supreme Court reviewed *Ditloff v. State Farm Fire & Cas. Co.*, 225 Neb. 375, 406 N.W.2d 101 (1987), and other cases addressing the issue of coverage under vandalism and mischief clauses of insurance policies, and it determined that in *Rohde*, the plaintiffs presented sufficient direct evidence to refute the insurer's theory that the water contamination of the oil was the result of condensation, raising the inference that someone intentionally contaminated the oil drum with water. Next, the Supreme Court addressed the issue of malice and concluded that it would be reasonable to expect that the oil for lubrication in the drum, when contaminated by water, would cause damage upon being used to service the irrigation units. Under those facts, the Supreme Court found that a presumption of malice arises and held that the trial court should not have granted a directed verdict.

The present case is distinguishable from *Ditloff* and *Rohde*. The question in both of those cases was whether the plaintiffs had presented sufficient circumstantial evidence to overcome motions for directed verdict. In both cases, the Nebraska Supreme Court found that the plaintiffs presented sufficient evidence to refute the insurer's theory as to the cause of loss and present the question of whether the evidence supported recovery under the insurance policy at issue to the jury. Here, following a full trial, the district court found that Rolling Meadow failed to carry its burden of bringing its claim within the limitations of the Farm Bureau insurance policy.

In this case, the district court found Hamers' testimony credible and persuasive and determined that Hamers established the cause of the fuel leak. The court noted evidence about the age of the filter assembly and the damage to the lower bolt and filter cone. The court noted evidence that the lower bolt had come loose sometime in the past, that someone tried to screw it back into the cone, and that it came loose again, resulting in the leak at issue. The court clearly did not find credible the suggestion in Walton's testimony that "some drunk cowboy" may have stolen some fuel. Rolling Meadow argues that the district court's determination of whether the evidence supported an inference of theft is irrelevant given that they alleged an act of vandalism and not theft. Contrary to Rolling Meadow's argument, the district court did not place undue weight on the evidence about theft in reaching its determination with respect to the question of vandalism. The court simply discounted that testimony as being credible evidence of what happened to cause the fuel leak. Again, the court noted that multiple witnesses testified to the lack of any signs of vandalism, and the court found Hamers' explanation that leak was caused by mechanical failure to be credible and persuasive. To the extent there was conflicting evidence about the location of certain components of the fuel filter assembly following the leak, the court resolved those conflicts in favor of Farm Bureau. In a bench trial of an action at law, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Malousek v. Meyer*, 309 Neb. 803, 962 N.W.2d 676 (2021). In our review, this court does not reweigh the evidence; we consider the evidence in the light most favorable to the successful party and resolve evidentiary conflicts in favor of the successful party. And, we will not set aside the district court's factual findings unless they are clearly wrong. See *Dietzel Enters. v. J. A. Wever Constr.*, 312 Neb. 426, 979 N.W.2d 517 (2022). Because the district court was not clearly wrong in finding no coverage under the insurance policy at issue, we affirm its judgment in favor of Farm Bureau.

CONCLUSION

The district court did not err in finding no coverage under the insurance policy at issue, entering judgment in favor of Farm Bureau, and dismissing Rolling Meadow's complaint.

AFFIRMED.